**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | FOR COURT USE ONLY *(SOLO PARA USO DE LA CORTE)* |
|---|---|
| **NOTICE TO DEFENDANT:** *(AVISO AL DEMANDADO):* THALES AVIONICS, INC., a Delaware corporation; THALES S.A., a public joint stock company organized under the laws of France; JEAN-MARC BUDIN, an individual; and DOES 1 through 20, inclusive, **YOU ARE BEING SUED BY PLAINTIFF:** *(LO ESTÁ DEMANDANDO EL DEMANDANTE):* WAMAR INTERNATIONAL, LLC, a California limited liability company, | **ELECTRONICALLY FILED** Superior Court of California, County of Orange **11/08/2018 at 06:11:03 PM** Clerk of the Superior Court By Georgina Ramirez,Deputy Clerk |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* | CASE NUMBER: *(Número del Caso):* |
|---|---|
| Orange County Superior Court, Civil Complex Center 751 West Santa Ana Blvd., Santa Ana, CA 92701 | 30-2018-01031861-CU-BC-CXC |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Joseph E. Thomas, Thomas Whitelaw & Kolegraff LLP, 18101 Von Karman Ave., Ste. 230, Irvine, CA 92612, (949) 679-6400
Arthur H. Barens, Law Offices of Arthur H. Barens, 10209 Santa Monica Blvd., Los Angeles, CA 90067, (310) 557-0444

| DATE: *(Fecha)* 11/08/18 | David H. Yamasaki, Clerk of the Court | Clerk, by *(Secretario)* | Granning | , Deputy *(Adjunto)* |
|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* THALES AVIONICS, INC., A DELAWARE CORPORATION

under: ☒ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
       ☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
       ☐ CCP 416.40 (association or partnership)      ☐ CCP 416.90 (authorized person)
       ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

[SEAL]

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF ORANGE**

# ALTERNATIVE DISPUTE RESOLUTION (ADR)
# INFORMATION PACKAGE

**NOTICE TO PLAINTIFF(S) AND/OR CROSS-COMPLAINANT(S):**

**Rule 3.221(c) of the California Rules of Court requires you to serve a copy of the ADR Information Package along with the complaint and/or cross-complaint.**

California Rules of Court – Rule 3.221
Information about Alternative Dispute Resolution (ADR)

(a) Each court shall make available to the plaintiff, at the time of filing of the complaint, an ADR Information Package that includes, at a minimum, all of the following:

(1) General information about the potential advantages and disadvantages of ADR and descriptions of the principal ADR processes.

(2) Information about the ADR programs available in that court, including citations to any applicable local court rules and directions for contacting any court staff responsible for providing parties with assistance regarding ADR.

(3) Information about the availability of local dispute resolution programs funded under the Dispute Resolutions Program Act (DRPA), in counties that are participating in the DRPA. This information may take the form of a list of the applicable programs or directions for contacting the county's DRPA coordinator.

(4) An ADR stipulation form that parties may use to stipulate to the use of an ADR process.

(b) A court may make the ADR Information Package available on its website as long as paper copies are also made available in the clerk's office.

(c) The plaintiff must serve a copy of the ADR Information Package on each defendant along with the complaint. Cross-complainants must serve a copy of the ADR Information Package on any new parties to the action along with the cross-complaint.

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF ORANGE

## ADR Information

**Introduction.**

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts and others offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. ADR is usually less formal, less expensive, and less time-consuming than a trial. ADR can also give people more opportunity to determine when and how their dispute will be resolved.

**BENEFITS OF ADR.**

Using ADR may have a variety of benefits, depending on the type of ADR process used and the circumstances of the particular case. Some potential benefits of ADR are summarized below.

**Save Time.**  A dispute often can be settled or decided much sooner with ADR; often in a matter of months, even weeks, while bringing a lawsuit to trial can take a year or more.

**Save Money.**  When cases are resolved earlier through ADR, the parties may save some of the money they would have spent on attorney fees, court costs, experts' fees, and other litigation expenses.

**Increase Control Over the Process and the Outcome.**  In ADR, parties typically play a greater role in shaping both the process and its outcome. In most ADR processes, parties have more opportunity to tell their side of the story than they do at trial. Some ADR processes, such as mediation, allow the parties to fashion creative resolutions that are not available in a trial. Other ADR processes, such as arbitration, allow the parties to choose an expert in a particular field to decide the dispute.

**Preserve Relationships.**  ADR can be a less adversarial and hostile way to resolve a dispute. For example, an experienced mediator can help the parties effectively communicate their needs and point of view to the other side. This can be an important advantage where the parties have a relationship to preserve.

**Increase Satisfaction.**  In a trial, there is typically a winner and a loser. The loser is not likely to be happy, and even the winner may not be completely satisfied with the outcome. ADR can help the parties find win-win solutions and achieve their real goals. This, along with all of ADR's other potential advantages, may increase the parties' overall satisfaction with both the dispute resolution process and the outcome.

**Improve Attorney-Client Relationships.**  Attorneys may also benefit from ADR by being seen as problem-solvers rather than combatants. Quick, cost-effective, and satisfying resolutions are likely to produce happier clients and thus generate repeat business from clients and referrals of their friends and associates.

**DISADVANTAGES OF ADR.**

ADR may not be suitable for every dispute.

**Loss of protections.**  If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.

**Less discovery.**  There generally is less opportunity to find out about the other side's case with ADR than with litigation.  ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

**Additional costs.**  The neutral may charge a fee for his or her services.  If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

**Effect of delays if the dispute is not resolved.**  Lawsuits must be brought within specified periods of time, known as statues of limitation.  Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.

## TYPES OF ADR IN CIVIL CASES.

The most commonly used ADR processes are arbitration, mediation, neutral evaluation and settlement conferences.

**Arbitration.**  In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are often relaxed. Arbitration may be either "binding" or "nonbinding." *Binding arbitration* means that the parties waive their right to a trial and agree to accept the arbitrator's decision as final. Generally, there is no right to appeal an arbitrator's decision. *Nonbinding* arbitration means that the parties are free to request a trial if they do not accept the arbitrator's decision.

**Cases for Which Arbitration May Be Appropriate.**  Arbitration is best for cases where the parties want another person to decide the outcome of their dispute for them but would like to avoid the formality, time, and expense of a trial. It may also be appropriate for complex matters where the parties want a decision-maker who has training or experience in the subject matter of the dispute.

**Cases for Which Arbitration May Not Be Appropriate.**  If parties want to retain control over how their dispute is resolved, arbitration, particularly binding arbitration, is not appropriate. In binding arbitration, the parties generally cannot appeal the arbitrator's award, even if it is not supported by the evidence or the law. Even in nonbinding arbitration, if a party requests a trial and does not receive a more favorable result at trial than in arbitration, there may be penalties.

**Mediation.**  In mediation, an impartial person called a "mediator" helps the parties try to reach a mutually acceptable resolution of the dispute. The mediator does not decide the dispute but helps the parties communicate so they can try to settle the dispute themselves. Mediation leaves control of the outcome with the parties.

**Cases for Which Mediation May Be Appropriate.**  Mediation may be particularly useful when parties have a relationship they want to preserve. So when family members, neighbors, or business partners have a dispute, mediation may be the ADR process to use. Mediation is also effective when emotions are getting in the way of resolution. An effective mediator can hear the parties out and help them communicate with each other in an effective and nondestructive manner.

**Cases for Which Mediation May Not Be Appropriate.**  Mediation may not be effective if one of the parties is unwilling to cooperate or compromise. Mediation also may not be effective if one of the parties has a significant advantage in power over the other. Therefore, it may not be a good choice if the parties have a history of abuse or victimization.

**Neutral Evaluation.**  In neutral evaluation, each party gets a chance to present the case to a neutral person called an "evaluator." The evaluator then gives an opinion on the strengths and weaknesses of each party's evidence and arguments and about how the dispute could be resolved. The evaluator is

often an expert in the subject matter of the dispute. Although the evaluator's opinion is not binding, the parties typically use it as a basis for trying to negotiate a resolution of the dispute.

**Cases for Which Neutral Evaluation May Be Appropriate.**  Neutral evaluation may be most appropriate in cases in which there are technical issues that require special expertise to resolve or the only significant issue in the case is the amount of damages.

**Cases for Which Neutral Evaluation May <u>Not</u> Be Appropriate.**  Neutral evaluation may not be appropriate when there are significant personal or emotional barriers to resolving the dispute.

**Settlement Conferences.**  Settlement conferences may be either mandatory or voluntary. In both types of settlement conferences, the parties and their attorneys meet with a judge or a neutral person called a "settlement officer" to discuss possible settlement of their dispute. The judge or settlement officer does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Settlement conferences are appropriate in any case where settlement is an option. Mandatory settlement conferences are often held close to the date a case is set for trial.

**ADDITIONAL INFORMATION.**

In addition to mediation, arbitration, neutral evaluation, and settlement conferences, there are other types of ADR, including conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR types.  The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute.

To locate a dispute resolution program or neutral in your community:
- Contact the California Department of Consumer Affairs, Consumer Information Center, toll free, at 1-800-852-5210
- Contact the Orange County Bar Association at (949) 440-6700
- Look in the telephone directories under "Arbitrators" or "Mediators"

Low cost mediation services are provided under the Orange County Dispute Resolution Program Act (DRPA).  For information regarding DRPA, contact:
- Waymakers (949) 250-4058

For information on the Superior Court of California, County of Orange court ordered arbitration program, refer to Local Rule 360.

The Orange County Superior Court offers programs for Civil Mediation and Early Neutral Evaluation (ENE).  For the Civil Mediation program, mediators on the Court's panel have agreed to accept a fee of $300 for up to the first two hours of a mediation session.  For the ENE program, members of the Court's panel have agreed to accept a fee of $300 for up to three hours of an ENE session.  Additional information on the Orange County Superior Court Civil Mediation and Early Neutral Evaluation (ENE) programs is available on the Court's website at www.occourts.org.

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name & Address):* | FOR COURT USE ONLY |
|---|---|

Telephone No.:                Fax No. (Optional):
E-Mail Address (Optional):
ATTORNEY FOR *(Name):*          Bar No:

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**
JUSTICE CENTER:
☐ Central – 700 Civic Center Dr. West, Santa Ana, CA 92701-4045
☐ Civil Complex Center – 751 W. Santa Ana Blvd., Santa Ana, CA 92701-4512
☐ Harbor – Newport Beach Facility – 4601 Jamboree Rd., Newport Beach, CA 92660-2595
☐ North – 1275 N. Berkeley Ave., P.O. Box 5000, Fullerton, CA 92838-0500

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **ALTERNATIVE DISPUTE RESOLUTION (ADR) STIPULATION** | CASE NUMBER: |
|---|---|

Plaintiff(s)/Petitioner(s), _____

_____

and defendant(s)/respondent(s), _____

_____

agree to the following dispute resolution process:

☐  Mediation

☐  Arbitration (must specify code)
          ☐  Under section 1141.11 of the Code of Civil Procedure
          ☐  Under section 1280 of the Code of Civil Procedure

☐  Neutral Case Evaluation

The ADR process must be completed no later than 90 days after the date of this Stipulation or the date the case was referred, whichever is sooner.

☐  I have an *Order on Court Fee Waiver* (FW-003) on file, and the selected ADR Neutral(s) are eligible to provide pro bono services.

☐  The ADR Neutral Selection and Party List is attached to this Stipulation.

We understand that there may be a charge for services provided by neutrals. We understand that participating in an ADR process does not extend the time periods specified in California Rules of Court, rule 3.720 et seq.

Date: _____

    _____     _____
    (SIGNATURE OF PLAINTIFF OR ATTORNEY)    (SIGNATURE OF PLAINTIFF OR ATTORNEY)

Date: _____

    _____     _____
    (SIGNATURE OF DEFENDANT OR ATTORNEY)    (SIGNATURE OF DEFENDANT OR ATTORNEY)

**ALTERNATIVE DISPUTE RESOLUTION (ADR) STIPULATION**

> ✓ *Plaintiff must serve a copy of these Guidelines with the Summons and Complaint.*



# GUIDELINES

## ALL COMPLEX CIVIL DEPARTMENTS

Welcome to the Complex Civil Litigation Program.  Orange County Superior Court is one of six courts designated by the California Judicial Council as pilot project courts to handle solely complex civil litigation.  These pilot courts were established to apply case management principles to improve the effective administration of justice by reducing the time and expense normally associated with the litigation of complex civil cases.  It has been our experience that these principles make it easier to prepare these cases for trial by providing a more orderly framework for the pre-trial phase of the litigation.

The result is a greater opportunity for early case resolution through mediation and settlement, and improving the way complex cases are tried by encouraging the use of technology.

Counsel's familiarity with the applicable *California Rules of Court ["Local Rules"]*, *Local Rules – Superior Court of California, County of Orange,* and these *Guidelines* is expected.  The *Guidelines* should answer most procedural questions and assist you in feeling comfortable in our courtrooms.

### COURTROOM DEMEANOR, CONDUCT AND ETIQUETTE

Counsel are expected to adhere to the provisions of the *California Attorney Guidelines of Civility and Professionalism.*  (State Bar of the State of California, adopted July 20, 2007, attached to these *Guidelines* as Appendix 1.)

1

## I. GENERAL MATTERS

1. When issued by the court, the provisions of the Case Management Order in the particular action shall govern over these *Guidelines*. Procedural matters not provided for in these *Guidelines* or in a Case Management Order shall be governed by the pertinent provisions of the California statutes, the California Rules of Court, and the California Standards of Judicial Administration. The purpose of these *Guidelines* is to supplement but not contradict the law governing civil procedure.

2. The Superior Court of California, County of Orange has established a system for e-filing in accordance with Code of Civil Procedure §1010.6 and California Rules of Court, rule 2.250 *et seq*. All papers filed in complex civil cases must be electronically filed unless a party has been specifically excused by the Court from the requirement, pursuant to the *Local Rules – Superior Court of California, County of Orange* ("local rules"), rule 308. To register for the program and to obtain additional information, go to: www.occourts.org/complexcivil/ .

3. Cross-complainants must serve a copy of these guidelines and give notice of any scheduled hearings and depositions at the time the cross-complaint is served.

4. Information about filing requirements or fees is available on the court's Internet home page at: http://www.occourts.org, or by telephone at (657) 622-5314. The local rules are available on the court's public internet home page.

5. Telephone appearances are conducted through **CourtCall**, pursuant to the provisions of California Rules of Court, Rule 3.670. Parties are encouraged to seek further information concerning guidelines and protocols from **CourtCall** at (310) 342-0888 or (888) 88-COURT.

## II. Initial Case Management Conference:

The Initial Case Management Conference shall take place in conformance with the requirements set forth in California Rules of Court, rule 3.750. The Initial Case Management Conference is generally scheduled approximately 90 days after the action is filed. Plaintiff is required to give notice of this conference date to all other parties. Thereafter, Status Conferences shall be set in consultation with the Court, according to the needs of the parties.

## III. Case Management Conference and Status Conference Statements:

The judges of the Civil Complex Center have determined that Judicial Council form CM-110, *Civil Case Management Statement* required by California Rules of Court, Rule 3.725(c) for some civil cases, is inadequate to provide the judges the information they need when determining how a particular complex case should be managed. ***Form CM-110 should not be used in any action designated or provisionally designated as***

*complex.* Instead, the parties shall file with the court either a Case Management Conference Statement or a Status Conference Statement as described below.

Counsel must file an updated Conference Statement for *each* Case Management or Status Conference. The Conference Statement is due no later than 5 court days prior to the hearing.

A Status Conference Statement may be filed as an alternative to the Case Management Conference Statement when appropriate. A Status Conference Statement is generally less detailed than a Case Management Conference Statement and is to be used to advise the court of progress or developments in the case which have occurred since the last review hearing.

A joint statement of the parties is preferred by the court whenever possible.

## IV. CASE MANAGEMENT ORDERS:

Case Management Orders are not required in all cases, but they may be helpful in cases where the sequencing and timing of key events is necessary in the management of the litigation and preparation of the case for trial. However, even if a Case Management Order is not necessary in a particular case, *all complex cases must be managed by counsel, or the court, or both.*

The goal of case management is to bring about a just resolution as speedily and economically as possible. To be effective, case management should be tailored to the needs of the particular litigation and to the resources available; make-work activity should be avoided. The parties or the court should develop and monitor an effective plan for the orderly conduct of pretrial and trial proceedings. A case management plan should prescribe a series of procedural steps, with firm dates, giving direction and order to the case as it progresses through pretrial proceedings to summary disposition or trial. The setting of interim time limits and deadlines is often a necessary part of an effective case management plan.

## V. LAW AND MOTION:

1. **Meet and Confer**: This court adopts the view that pre-filing conferences between counsel may be useful in avoiding useless or unnecessary motions. Therefore, prior to the hearing of any motion, petition or application, except applications to appear *pro hac vice* and motions to withdraw as counsel of record, all counsel and parties appearing in *propria persona* shall confer in a good faith attempt to eliminate the necessity of the hearing or resolve as many disputes as possible.

   Counsel for the moving party shall arrange the conference to meet and confer and, at least 3 calendar days before the hearing, file with the court a statement entitled "Meet and Confer," summarizing the issues remaining in dispute and the respective positions taken.

2. **Tentative Rulings**: Members of the Complex Civil Panel may publish tentative law and motion rulings by any system described in Local Rule 382.

3. **Off Calendars and Continuances:** In order to promote judicial economy and avoid wasting court resources, counsel for moving parties must notify the courtroom clerk as soon as possible if any matter will be taken off calendar. Stipulations between the parties to continue a matter must be approved by the court.

## VI. EX PARTE APPLICATIONS:

1. The court's consideration of an *ex parte* application will not interfere with or delay any trial in progress.  The moving party is expected to adhere to the provisions of California Rules of Court, Rule 3.1200 – 3.1207. All papers necessary to the determination of the application, including any proposed pleading, motion or order, must be submitted with the *ex parte* application. Counsel should contact the courtroom clerk to verify any specific deadlines for the submission of moving papers or other preferences applicable to that department.  Counsel may also contact the courtroom clerk to inquire if oral argument will be permitted, or if the court will rule based on the application and any written opposition.

2. The application shall include a declaration of Notice of Ex Parte Hearing and a proposed order; and shall state in the notice the irreparable harm, immediate danger or other basis for *ex parte* relief that will result if the requested relief is not granted until a regularly noticed motion may be heard.

## VII. MANDATORY SETTLEMENT CONFERENCES ("MSC's"):

Compliance with Local Rule 316 is required.

All of the judges at the Civil Complex Center are willing to help another judge in the settlement of a complex case depending upon the judge's available calendar.  If the parties agree to have a mandatory settlement conference conducted by a judge other than the assigned judge, the parties should first determine the other judge's availability before asking the assigned judge to order the settlement conference. However, it is not presumed that the judge to whom a case is assigned should not conduct the mandatory settlement conferences in his or her cases.  If a party objects to the trial judge's participation in the MSC, the party must advise the judge or the courtroom clerk of its objection prior to the setting of the MSC. Counsel are advised to check with the court to determine its preference in this regard.

## VIII. Pre-trial Conferences

1. A Pre-trial Conference may be scheduled 30-90 days before trial for the purpose of determining the readiness of the parties and       resolving procedural issues concerning the trial. The goal of the Pre-trial Conference is to make the trial proceed as predictably and smoothly as possible.  **The Pre-trial**

**Conference is not a substitute for the Issues Conference required by Local Rule 317.**

2. At the Pre-trial Conference, counsel should be prepared to state whether his or her client will be using the electronic presentation of evidence at the trial. Using electronic equipment to present evidence at trial requires preparation, organization and cooperation by the parties. The court expects that the parties will work together in devising a protocol for the pre-marking of exhibits by using prefixes or a super-numeration system to designate the proponent of the evidence. Where there are multiple pages to a single exhibit, each page should be bates-stamped. Counsel should contact the courtroom clerk to determine if the trial judge has a specific preference for how exhibits should be marked.

3. In a case where it is reasonable to presume voluminous documents will be produced during discovery, counsel are urged to agree upon a protocol for the pre-marking of exhibits at the earliest time possible, preferably before the initiation of discovery and delivery to a document depository. It is less expensive to mark and index voluminous documents as they are deposited than when it is done on the eve of trial.

4. Counsel are required to cooperate throughout the trial so that one party's electronic exhibits are available to the other side to display during cross-examination.

5. The electronic version of documents, photographs, charts or other demonstrative evidence may be substituted for the actual exhibit at trial upon the stipulation of the parties and order of the court. This guideline is not meant to alter the rules of discovery or the obligation of a party to make available the original of a document for inspection by another party through discovery or at the Issues Conference.

6. Physical exhibits and documents are not required to be presented in a digitalized format. However, evidence which has not been presented in electronic form customarily will be ordered by the court returned at the end of the appeal period to the party which offered it. Before trial commences, counsel will be asked to sign a stipulation for the return and maintenance of the exhibits. Plaintiff will maintain joint exhibits unless the court orders otherwise.

## IX. Use of the Court's Evidence Presentation Systems

1. **On-Site Electronic Evidence Presentation Systems:** Every courtroom has the capability of being equipped with court-based evidence presentation systems for use by the parties. Counsel are strongly encouraged to take advantage of the benefits of the electronic presentation of evidence when in trial at the Civil Complex Center to enhance the orderly and effective presentation of evidence, reduce concerns about the custody and security of exhibits, and reduce the work and expense associated with the tagging, storing and transporting of exhibits. In an appropriate case, the court may require the

use of an electronic evidence presentation system. Electronic evidence presentation systems must be compatible with the court's infrastructure (video distribution amplifier, wiring, conduit, floor receptacles and connectors).

2. **Electronic Evidence Standard Format:** Counsel presenting evidence that is exclusively electronic in form must present the evidence in PDF file format and stored on CD-R. Whenever evidence is presented electronically, the physical custody of exhibits by the clerk is replaced by the electronic record of the exhibits. Evidence must be in sequential order with the exception of JPEG and MPEG files which shall be stored on separate discs. Counsel may also prepare electronic evidence using alternate non-proprietary formats subject to the approval of the court. The compact discs (CDs) must be labeled as follows:

Case #
Case Name
Exhibits ____ to ____
(Original or Backup copy)

The courtroom clerk will maintain an updated exhibit list. When evidence is electronically presented at the trial, the court may require counsel to periodically submit to the clerk an up-to-date CD containing exhibits received into evidence.

It is counsels' responsibility to identify and track redactions, modifications, and substitution of exhibits. Counsel are expected to be prepared to submit an up-to-date evidence CD with all redactions, modifications, and substitutions, as well as impeachment documents used, upon the courtroom clerk's request.

Impeachment exhibits are not pre-marked. However, counsel are responsible for having the document electronically recorded upon being offered into evidence (exhibit numbers may be reserved for this purpose).

If the jury will be provided the evidence in electronic format for its deliberation, the parties are required to meet and confer and submit the final joint exhibit list containing only those exhibits received into evidence. The CD used by the jurors must include the joint exhibit list and the electronically stored exhibits which have been entered into evidence. Submission of the joint evidence CD also serves as a stipulation that all exhibits presented in electronic form to the jury are complete and correct. Any disagreement must be brought to the attention of the court at the earliest reasonable time. Counsel must lodge two (2) evidence CDs of all exhibits received into evidence.

## X.  TRIALS – MOTIONS IN LIMINE

Counsel should attempt to resolve evidentiary disputes at the Local Rule 317 Issues Conference before resorting to filing a motion *in limine.* It is frequently more productive of court time, and the client's money for counsel to informally address at the Issues Conference the issues which could be raised in motions *in limine* and, instead of a motion, present a stipulation to the court on uncontested issues. Matters of day-to-day

trial logistics and common professional courtesy should not be the subject of motions *in limine*. These are matters of common professional courtesy that should be accorded counsel in all trials. See, <u>Kelly v. New West Federal Savings</u> (1996) 49 Cal.App.4[th] 659,671.

APPENDIX 1
**California Attorney Guidelines of Civility and Professionalism**
(Abbreviated, adopted July 20, 2007)

INTRODUCTION. As officers of the court with responsibilities to the administration of justice, attorneys have an obligation to be professional with clients, other parties and counsel, the courts and the public. This obligation includes civility, professional integrity, personal dignity, candor, diligence, respect, courtesy, and cooperation, all of which are essential to the fair administration of justice and conflict resolution.

These are guidelines for civility. The Guidelines are offered because civility in the practice of Law promotes both the effectiveness and the enjoyment of the practice and economical client representation. The legal profession must strive for the highest standards of attorney behavior to elevate and enhance our service to justice. Uncivil or unprofessional conduct not only disserves the individual involved, it demeans the profession as a whole and our system of justice.

These voluntary Guidelines foster a level of civility and professionalism that exceed the minimum requirements of the mandated Rules of Professional Conduct as the best practices of civility in the practice of law in California. The Guidelines are not intended to supplant these or any other rules or laws that govern attorney conduct. Since the Guidelines are not mandatory rules of professional conduct, nor rules of practice, nor standards of care, they are not to be used as an independent basis for disciplinary charges by the State Bar or claims of professional negligence.

The Guidelines are intended to complement existing codes of professionalism adopted by bar associations in California. Individual attorneys are encouraged to make these guidelines their personal standards by taking the pledge that appears at the end. The Guidelines can be applicable to all lawyers regardless of practice area. Attorneys are encouraged to comply with both the spirit and letter of these guidelines, recognizing that complying with these guidelines does not in any way denigrate the attorney's duty of zealous representation.

SECTION 1. The dignity, decorum and courtesy that have traditionally characterized the courts and legal profession of civilized nations are not empty formalities. They are essential to an atmosphere that promotes justice and to an attorney's responsibility for the fair and impartial administration of justice.

SECTION 2. An attorney should be mindful that, as individual circumstances permit, the goals of the profession include improving the administration of justice and contributing time to persons and organizations that cannot afford legal assistance.

An attorney should encourage new members of the bar to adopt these guidelines of civility and professionalism and mentor them in applying the guidelines.

SECTION 3. An attorney should treat clients with courtesy and respect, and represent them in a civil and professional manner. An attorney should advise current and potential clients that it is not acceptable for an attorney to engage in abusive behavior or other conduct unbecoming a member of the bar and an officer of the court.

As an officer of the court, an attorney should not allow clients to prevail upon the attorney to engage in uncivil behavior.

An attorney should not compromise the guidelines of civility and professionalism to achieve an advantage.

SECTION 4. An attorney's communications about the legal system should at all times reflect civility, professional integrity, personal dignity, and respect for the legal system. An attorney should not engage in conduct that is unbecoming a member of the Bar and an officer of the court.

Nothing above shall be construed as discouraging the reporting of conduct that fails to comply with the Rules of Professional Conduct.

SECTION 5. An attorney should be punctual in appearing at trials, hearings, meetings, depositions and other scheduled appearances.

SECTION 6. An attorney should advise clients that civility and courtesy in scheduling meetings, hearings and discovery are expected as professional conduct.

In considering requests for an extension of time, an attorney should consider the client's interests and need to promptly resolve matters, the schedules and willingness of others to grant reciprocal extensions, the time needed for a task, and other relevant factors.

Consistent with existing law and court orders, an attorney should agree to reasonable requests for extensions of time that are not adverse to a client's interests.

7

SECTION 7. The timing and manner of service of papers should not be used to the disadvantage of the party receiving the papers.

SECTION 8. Written materials directed to counsel, third parties or a court should be factual and concise and focused on the issue to be decided.

SECTION 9. Attorneys are encouraged to meet and confer early in order to explore voluntary disclosure, which includes identification of issues, identification of persons with knowledge of such issues, and exchange of documents.

Attorneys are encouraged to propound and respond to formal discovery in a manner designed to fully implement the purposes of the California Discovery Act.

An attorney should not use discovery to harass an opposing counsel, parties or witnesses. An attorney should not use discovery to delay the resolution of a dispute.

SECTION 10. An attorney should consider whether, before filing or pursuing a motion, to contact opposing counsel to attempt to informally resolve or limit the dispute.

SECTION 11. It is important to promote high regard for the profession and the legal system among those who are neither attorneys nor litigants. An attorney's conduct in dealings with nonparty witnesses should exhibit the highest standards of civility.

SECTION 12. In a social setting or otherwise, an attorney should not communicate ex parte with a judicial officer on the substance of a case pending before the court, unless permitted by law.

SECTION 13. An attorney should raise and explore with the client and, if the client consents, with opposing counsel, the possibility of settlement and alternative dispute resolution in every case as soon possible and, when appropriate, during the course of litigation.

SECTION 14. To promote a positive image of the profession, an attorney should always act respectfully and with dignity in court and assist the court in proper handling of a case.

SECTION 15. An attorney should not take the default of an opposing party known to be represented by counsel without giving the party advance warning.

SECTION 16. An attorney should avoid even the appearance of bias by notifying opposing counselor an unrepresented opposing party of any close, personal relationships between the attorney and a judicial officer, arbitrator, mediator or court-appointed expert and allowing a reasonable opportunity to object.

SECTION 17. An attorney should respect the privacy rights of parties and non-parties.

SECTION 18. An attorney should negotiate and conclude written agreements in a cooperative manner and with informed authority of the client.

In addition to other applicable Sections of these Guidelines, attorneys engaged in a transactional practice have unique responsibilities because much of the practice is conducted without judicial supervision.

SECTION 19. In addition to other applicable Sections of these Guidelines, in family law proceedings an attorney should seek to reduce emotional tension and trauma and encourage the parties and attorneys to interact in a cooperative atmosphere, and keep the best interests of the children in mind.

SECTION 20. In addition to other applicable Sections of these Guidelines, criminal law practitioners have unique responsibilities. Prosecutors are charged with seeking justice, while defenders must zealously represent their clients even in the face of seemingly overwhelming evidence of guilt. In practicing criminal law, an attorney should appreciate these roles.

SECTION 21. Judges are encouraged to become familiar with these Guidelines and to support and promote them where appropriate in court proceedings.

ATTORNEY'S PLEDGE. I commit to these Guidelines of Civility and Professionalism and will be guided by a sense of integrity, cooperation and fair play.

I will abstain from rude, disruptive, disrespectful, and abusive behavior, and will act with dignity, decency, courtesy, and candor with opposing counsel, the courts and the public.

As part of my responsibility for the fair administration of justice, I will inform my clients of this commitment and, in an effort to help promote the responsible practice of law, I will encourage other attorneys to observe these Guidelines.

(Rev. May 4, 2010)

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Joseph E. Thomas (State Bar No. 101443)<br>Thomas Whitelaw & Kolegraff LLP<br>18101 Von Karman Avenue, Suite 230, Irvine, CA 92612<br>TELEPHONE NO.: (949) 679-6400    FAX NO.: (949) 679-6405<br>ATTORNEY FOR *(Name):* Plaintiff Wamar International, LLC | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of Orange<br>**11/08/2018** at 06:10:37 PM<br>Clerk of the Superior Court<br>By Georgina Ramirez, Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  ORANGE
STREET ADDRESS: 751 West Santa Ana Boulevard
MAILING ADDRESS:
CITY AND ZIP CODE: Santa Ana, CA 92701
BRANCH NAME: Civil Complex Center

CASE NAME:
Wamar International, LLC v. Thales Avionics, Inc., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER: |
|---|---|---|---|
| ☑ **Unlimited**<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ **Limited**<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ **Counter**  ☐ **Joinder**<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | 30-2018-01031861-CU-BC-CXC |
| | | | JUDGE: Judge Glenda Sanders |
| | | | DEPT: CX-101 |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☑ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☑ is  ☐ is not    complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☑ Large number of separately represented parties   d. ☑ Large number of witnesses
   b. ☑ Extensive motion practice raising difficult or novel   e. ☐ Coordination with related actions pending in one or more courts
      issues that will be time-consuming to resolve      in other counties, states, or countries, or in a federal court
   c. ☑ Substantial amount of documentary evidence   f. ☑ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary   b. ☑ nonmonetary; declaratory or injunctive relief   c. ☑ punitive
4. Number of causes of action *(specify):* 14 (see Attachment No. 4).
5. This case ☐ is  ☑ is not    a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: November 8, 2018

Joseph E. Thomas
_____
(TYPE OR PRINT NAME)          ▶ _____
                               (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

MC-025

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Wamar International, LLC v. Thales Avionics, Inc., et al. | |

**ATTACHMENT** *(Number):* 4

*(This Attachment may be used with any Judicial Council form.)*

4. Number of causes of action (specify):

1. Breach of Contract;
2. Intentional Misrepresentation;
3. Negligent Misrepresentation;
4. Intentional Misrepresentation;
5. Breach of Implied Covenant;
6. Restitution/Unjust Enrichment;
7. Intentional Interference with Contractual Relations;
8. Intentional Interference with Prospective Economic Relations;
9. Conspiracy to Commit Fraud;
10. Aiding and Abetting Intentional Misrepresentation;
11. Aiding and Abetting Breach of Implied Covenant; and
12. Quantum Meruit;
13. RICO
14. Declaratory Relief

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page 1 of 1

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT
to Judicial Council Form**

www.courtinfo.ca.gov

ELECTRONICALLY FILED
Superior Court of California,
County of Orange
11/08/2018 at 06:10:37 PM
Clerk of the Superior Court
By Georgina Ramirez,Deputy Clerk

1 | JOSEPH E. THOMAS (State Bar No. 101443)
*jthomas@twtlaw.com*
2 | WILLIAM J. KOLEGRAFF (State Bar No. 183861)
*wkolegraff@twtlaw.com*
3 | WILLIAM S. SANDERSON (State Bar No. 189553)
*wsanderson@twtlaw.com*
4 | **THOMAS WHITELAW & KOLEGRAFF LLP**
18101 Von Karman Avenue, Suite 230
5 | Irvine, California 92612-7132
Telephone:    (949) 679-6400
6 | Facsimile:    (949) 679-6405

7 | ARTHUR H. BARENS (State Bar No. 43215)
*barens@barenslaw.com*
8 | **LAW OFFICES OF ARTHUR H. BARENS**
10209 Santa Monica Boulevard
9 | Los Angeles, California 90067
Telephone:    (310) 557-0444

10 |
11 | Attorneys for Plaintiff WAMAR
INTERNATIONAL, LLC

12 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13 | **COUNTY OF ORANGE, CENTRAL JUSTICE CENTER**

14 | WAMAR INTERNATIONAL, LLC, a
California limited liability company,

CASE NO. 30-2018-01031861-CU-BC-CXC
**COMPLAINT FOR:**   Judge Glenda Sanders

15 |    Plaintiff,
**(1) BREACH OF CONTRACT;**
**(2) INTENTIONAL**

16 |    vs.
   **MISREPRESENTATION;**
**(3) NEGLIGENT**

17 |
   **MISREPRESENTATION;**

THALES AVIONICS, INC., a Delaware
18 | corporation; THALES S.A., a public joint
stock company organized under the laws of
19 | France; JEAN-MARC BUDIN, an individual;
and DOES 1 through 20, inclusive,
**(4) INTENTIONAL**
   **MISREPRESENTATION;**
**(5) BREACH OF IMPLIED COVENANT;**
**(6) RESTITUTION/UNJUST**

20 |    Defendants.
   **ENRICHMENT;**
**(7) INTENTIONAL INTERFERENCE**

21 |
   **WITH CONTRACTUAL**
   **RELATIONS;**

22 |
**(8) INTENTIONAL INTERFERENCE**
   **WITH PROSPECTIVE ECONOMIC**
   **RELATIONS;**

23 |
**(9) CONSPIRACY TO COMMIT FRAUD;**
**(10) AIDING AND ABETTING**

24 |
   **INTENTIONAL**
   **MISREPRESENTATION;**

25 |
**(11) AIDING AND ABETTING BREACH**
   **OF IMPLIED COVENANT;**

26 |
**(12) QUANTUM MERUIT;**
**(13) RICO**

27 |
**(14) DECLARATORY RELIEF**

28 |
**DEMAND FOR JURY TRIAL**

193117

CX-101

1    Plaintiff WAMAR INTERNATIONAL LLC hereby alleges, on knowledge as to itself, but

2    otherwise on information and belief, as follows:

3                                        **I. PARTIES**

4        1.      Plaintiff WAMAR INTERNATIONAL LLC (hereinafter referred to as "Wamar")

5    is a California limited liability company, having its registered office in Simi Valley, CA, and is

6    duly qualified to conduct business in the State of California.

7        2.      The President and Chief Executive Officer of Wamar is a United States citizen and

8    is the majority owner of Wamar's ultimate parent company.

9        3.      Wamar and its principal have extensive experience, practice and expertise in the

10   aviation business worldwide.

11       4.      Defendant THALES AVIONICS, INC. (hereinafter referred to as "Thales

12   Avionics") is a corporation organized and existing under the laws of the state of Delaware, having

13   its principal place of business in Irvine, California.

14       5.      Upon information and belief, Thales Avionics specializes in the supply, delivery,

15   installation and maintenance of in-flight entertainment systems (hereinafter collectively referred to

16   as "IFE systems") for large commercial airlines on a global basis.  IFE systems provide airline

17   passengers with the ability to watch movies/TV on seat-back screens, listen to music, access Wi-Fi

18   and more. Typically an airline operator will select a provider for the installation of IFE system

19   onto newly purchased aircraft, and at a later time add connectivity and other technologies to the

20   system.  The connectivity technology adds features such as passenger internet access.  The IFE

21   systems and the connectivity technology may be provided by the same company or by different

22   companies.

23       6.      Defendant THALES S.A. (hereinafter referred to as "Thales S.A.") is a public joint

24   stock company organized and existing under the international laws of France.

25       7.      Upon information and belief, Thales S.A. is the parent company of Thales

26   Avionics, with Thales Avionics being a wholly-owned subsidiary of Thales S.A.  Thales S.A. is

27   25.8% owned by the government of France.

28       8.      Upon information and belief, Thales S.A. is also the parent company of The Thales

193117

1  Group of companies, a $19 billion dollar per year enterprise with operations in 56 countries.

2       9.     Thales Group is a worldwide group of companies that have roles in aerospace,

3  transport, defense, and security domains.

4       10.     Thales International Middle East & Western Asia SAL (hereinafter referred to as

5  "Thales SAL"), is a company organized and existing under the laws of Lebanon, recorded at the

6  Beirut Commercial Register - Offshore companies special register number 1805913 - having its

7  registered office located in- Beirut, Lebanon.

8       11.     Thales SAL operates within the Thales Group in the Middle East.

9       12.     Thales International Western Countries B.V. (hereinafter referred to as "Thint

10  WECO") is a company organized and existing under the Law of The Netherlands, having its

11  registered address in Luchthaven Schiphol, The Netherlands.

12       13.     Thint WECO operates within the Thales Group in Western European and Middle

13  East countries.

14       14.     Thales AMEWA FZE (hereinafter referred to as "Thales AMEWA") is a company

15  organized and existing under the laws of The United Arab Emirates, having its registered address

16  in the Dubai Airport Free Zone, United Arab Emirates (hereinafter referred to as "U.A.E.")

17       15.     Thales AMEWA operates within the Thales Group in Africa, the Middle East and

18  Western Asia.

19       16.     In some cases, various Thales Group entities or personnel acted in concert to

20  benefit not only Thales Avionics or Thales S.A. specifically, but the Thales Group generally, such

21  that it is impossible to limit the Thales Group personnel or the Thales Group beneficiaries to a

22  single Thales Group company.  This Complaint simply refers to "Thales" in such generalized

23  instances.

24       17.     Defendant JEAN-MARC BUDIN ("Budin") is an individual.

25       18.     Upon information and belief Budin is Thales S.A.'s Senior Vice President - Middle

26  East, Africa & India.  Budin was in frequent communication with Wamar senior management

27  throughout the time period covered by this complaint, giving direction to Wamar and receiving

28  updates from Wamar.

193117

19.   TABA GENERAL TRADING & INVESTMENT COMPANY LLC (hereinafter referred to as "TABA") is a limited liability company, an American-owned business, with a U.S. taxpayer identification number, organized and existing under the Law of Jordan, having its registered office in Amman, Jordan.

20.   TABA operates within the Wamar Group in the Middle East.

21.   TABA's Chief Executive Officer is the sole owner of TABA.

22.   TABA and its principal have extensive experience, practice and expertise in the aviation business worldwide.

23.   Wamar is ignorant of the true names and a capacity of defendants sued herein as DOES 1 through 20, inclusive, and therefore sues these defendants by such fictitious names. Wamar will amend this Complaint to allege their true names and capacities when ascertained.

24.   On information and belief, Wamar alleges that all defendants are, in some manner, partially or equally responsible for the acts and omissions alleged in this Complaint that caused Wamar's injuries and damages.

25.   On information and belief, Wamar alleges that at all times each defendant was the alter ego, joint venturer, agent, servant, employee, partner, or surety of the other defendants and was acting within the scope of such venture, agency, employment, partnership, or suretyship, with the knowledge, consent, or ratification of each of the other defendants in doing the things alleged in this Complaint.

## II. VENUE AND JURISDICTION

26.   Venue is proper in this Court under California Code of Civil Procedure § 395 et seq. because the contracts which are the subject of this complaint were made in Orange County, California, and Wamar's and Thales Avionics' principal places of business are in Orange County, California.

27.   This Court has jurisdiction over Thales S.A. because the contracts which are the subject of this complaint were made in Orange County, California and Thales S.A. subjected itself to this Court's jurisdiction when it made material false representations to Wamar in Orange County, California and conspired with Thales Avionics to commit fraud against Wamar.

28.     This Court has jurisdiction over Budin because he subjected himself to this Court's jurisdiction when he made material false representations to Wamar in Orange County, California and conspired with Thales Avionics and Thales S.A. to commit fraud against Wamar.

## III. FACTUAL BACKGROUND

### *Introductory Statement*

29.     For at least 7 years Thales violated its own internal compliance rules, and possibly even US and French compliance regulations and laws. It did so for money. Lots of money. But suddenly, at the end of 2017, Thales got spooked by its mounting compliance violations, and began trying to re-write the facts to avoid the severe consequences for its actions. First, it forced its long-time senior compliance officer out of Thales, paying him an enormous "golden parachute" to have him quietly leave the company. Then, Thales engaged in a desperate conspiracy to cover-up its malfeasance at the expense of Wamar and Taba. But Thales cannot so easily wipe the slate clean. It is indisputable that Thales directed Taba (owned by Wamar senior management) to act as a business consultant to obtain airline contracts worth billions, and agreed to pay Taba a fee for its successes. And it is also indisputable that Thales directed Wamar (also owned by Wamar senior management) to act as an in-country Key Industrial Partner (KIP), and agreed to pay Wamar a fee for its successes. Thales directed Taba and Wamar to work on the same projects, knowing full well that its internal compliance rules, and possibly U.S. and French laws, forbid using Wamar senior management in both capacities.

30.     Defendant Jean-Marc Budin is central to both (1) directing the compliance violations, and (2) managing the cover-up. It was Mr. Budin that orchestrated the efforts to entice both Wamar and Taba to work for Thales on the same projects. As a key executive of Thales, he would have been fully aware that he was violating internal Thales compliance rules, and possibly U.S. and French laws, by directing Wamar senior management to act both as a business consultant and a KIP for the same project. But he did so because he knew that Wamar and Taba could deliver billions in value to Thales, which they did. Mr. Budin's violations not only put him at risk of discipline within Thales, but Mr. Budin's actions may put Thales in the crosshairs of French

and US compliance regulators, and expose Thales to governmental sanctions, and fines, a press

disaster, and a resulting loss of significant business.  With this level of risk, Mr. Budin is now in

full cover-up mode.

31.     Prior to engaging Wamar, Thales, despite its intricate web of worldwide operating

companies, was incapable of establishing any meaningful IFE systems business in the Middle East

region.  In fact, its competitor Panasonic had the Middle Eastern IFE systems business secured,

leaving Thales powerless to gain any foothold in the lucrative Middle East IFE systems market.

On the rare occasion when Thales managed to win an IFE systems contract, they were naïve and

ineffective in performing, which resulted in inevitably losing the business.  Thales was a total

mess in the Middle East.

32.     Wamar's principal is a U.S. citizen of Jordanian descent who has conducted

substantial business in the Middle East for over 40 years.  Wamar's senior management is known

for having developed substantial personal relationships within the aviation industry in general

throughout the world, and in the Middle East in particular, as well as with significant national

leaders worldwide.

33.     Thales and Budin were fully aware of Wamar senior management's expertise in the

airline/aviation business, and aggressively sought them out to bolster and promote the Thales IFE

system.  With the help of Wamar senior management, Thales was confident it could finally break

into valuable airline markets in the Middle East and other areas in the world.

34.     Wamar senior management, through the Wamar and TABA companies, agreed to

help Thales, and entered into agreements with several of Thales' operating companies.  As will be

detailed below, each of the agreements with Thales followed a similar pattern:  (1) Wamar senior

management agreed to assist in obtaining specific contracts for the installation of IFE systems for

Thales with specific airline companies, and (2) Thales agreed to award local work and pay Wamar

and TABA when the contract was awarded to Thales.  As it turned out, Wamar senior

management was astonishingly successful in obtaining IFE systems contracts for Thales,

increasing Thales' market share of IFE systems for Middle Eastern airlines from *zero* percent (0%)

1  to sixty percent (60%), and thereby earned substantial fees and royalties for its work as

2  documented. As described herein more completely, Thales did not pay. Instead, after it had the

3  contracts in hand, Thales would contrive excuses and devise intricate schemes to dodge its

4  payment obligations to Wamar.

5       35.     It has now become apparent that Thales' world-wide scheme to defraud Wamar

6  was a well-orchestrated and meticulously-executed conspiracy. Thales is a monstrous international

7  behemoth, and it used its size, wealth, and legal resources to manipulate Wamar's senior

8  management.

9       36.     Thales and Budin refused to pay Wamar and TABA what was owed in order to (1)

10 reap the windfall of successful contracts without paying what they promised, and (2) cover up the

11 fact that by retaining TABA as a business advisor and Wamar as a KIP Thales was knowingly and

12 intentionally violating U.S. and French laws and regulations.

13      37.     Over the span of 7 years, Wamar senior management and Wamar have secured over

14 $2B in contracts on behalf of the Defendants with large airline and transport companies in the

15 Middle Eastern region. Instead of paying outstanding agreed-upon consulting fees to Wamar, the

16 Defendants have conspired to induce Wamar's continued performance with no intention of ever

17 paying what is owed.

18      38.     The process used by Defendants (whether Thales Avionics, Thales SAL, Thales

19 S.A. or other Thales Group companies and Budin acting on behalf of Thales) has been consistent

20 to the point of being a conspiracy:

21      a.      Seek out Wamar's help on lucrative contracts that Thales could never secure on its

22              own;

23      b.      Induce Wamar's performance with promises of consulting fees, subcontract work

24              and spare parts distribution throughout the area if Wamar was successful in

25              delivering the contracts;

26      c.      Wait patiently for Wamar to deliver the contracts;

27      d.      Fabricate an excuse not to pay Wamar; and

28      e.      Reap the rewards of Wamar's efforts.

193117

1    39.    Finally, when Wamar senior management pressed Thales for payment of the fees

2  due to Wamar and TABA, Thales refused, necessitating this Complaint.

3    40.    Thales' agreements with Wamar and TABA involve a number of Thales

4  companies, covering activities with several airline transport companies (and one rail company), in

5  different Gulf State countries, and provide for dispute resolution venues around the world.  This

6  complaint addresses only those claims and those agreements which are subject to this Court's

7  jurisdiction.

8  ***The Emirates Airline Projects***

9    41.    Wamar, its principal and senior executives, have a significant presence and

10  influence and are well known and respected for their experience, practice and expertise in the

11  global aviation and transport business, particularly in Middle Eastern countries.  Wamar and its

12  principal own and operate manufacturing and development facilities in the Middle East, Europe

13  and the United States.

14    42.    Prior to 2011, Thales Avionics had for many years labored to grow its airline IFE

15  systems business in the Middle East but was wholly unsuccessful. Thales Avionics had utterly

16  failed in securing business with Turkish Airlines, Kuwait Airways, Emirates Airlines and Qatar

17  Airways, among other airline companies.

18    43.    Thales Avionics' inability to get airline business in the Middle East continued into

19  2011 when Thales Avionics unsuccessfully attempted to secure a large IFE systems contract with

20  several airlines, such as Emirates.  Thales Avionics pursued, but on its own could not win

21  Emirates business. Indeed, Thales Avionics had little chance of ever acquiring any Emirates IFE

22  systems business on its own, as Emirates had used Panasonic as its IFE systems supplier for over

23  30 years and had indicated its intention to stay with Panasonic into the future.  After years of

24  failure, Thales Avionics knew it needed professional assistance and guidance if it were to oust

25  Panasonic and achieve success in the aviation industry, particularly in the Middle East.

26    44.    Therefore, Thales Avionics approached Wamar to seek its advice and assistance in

27  finally winning an Emirates opportunity.  Thales knew that Wamar senior management had

28  extensive personal relationships with senior executives at several airline companies, particularly in

193117

7

COMPLAINT

the Middle Eastern region.  It was because of this reputation and expertise in the airline industry, that Thales targeted Wamar and its senior management as the experts who could turn Thales' Middle East failures into successes.  In furtherance of that effort, on December 21, 2012, Wamar and Thales Avionics entered into a binding contract (hereinafter referred to as the "Emirates 2012 MOU") regarding the pursuit of business with Emirates.

45.     At this particular time, Emirates was actively in the process of selecting a company to: (1) supply, deliver and install a large number of IFE systems on its fleet of Airbus 380 (hereinafter referred to as "A380") and Boeing 777X (hereinafter referred to as "B777X") aircraft; and (2) establish and operate an IFE systems repair and parts distribution facility, as well as a high tech Discovery Innovation Center in Dubai to develop and market IFE systems technology for Thales (hereinafter collectively referred to as "The Project").

46.     Thales Avionics desperately wanted to win The Project but did not have a facility in Dubai that satisfied the requirements of Emirates and had no idea how it could finally replace the well-entrenched Panasonic IFE system. Accordingly, aware of Wamar's experience and its principal's personal connections with decision-level executives in the Middle East in particular, Thales Avionics sought out Wamar and its senior management for assistance with (1) pursuing the IFE systems business with Emirates, and (2) developing the Dubai facility.

47.     In the Emirates 2012 MOU, Thales Avionics promised that if Wamar secured The Project for Thales Avionics, then Thales Avionics would subcontract operation of the IFE systems repair, logistics, installment and parts distribution facility, and the Discovery Innovation Center in Dubai (hereinafter referred collectively as the "The Dubai Centers") to Wamar. Thales S.A. represented that operating The Dubai Centers over a 26-year period would be worth more than $150M plus, over and above the normal profit to Wamar if Emirates awarded Thales Avionics a contract for (150) aircraft. In addition, Wamar could potentially earn a much greater profit because The Dubai Centers would service other airline customers of Thales and service other types of aircrafts such as A380, A350, A330, A320, A319, B737, B787 among other types.

48.     The Emirates 2012 MOU set forth the terms and conditions under which Thales Avionics and Wamar would execute a subcontract for The Dubai Centers when: 1) Thales

1  Avionics was awarded the contract by Emirates for The Project; and 2) Wamar was formally

2  approved as a Key Industrial Partner (hereinafter referred to as "KIP") by Thales S.A.

3      49.    The Emirates 2012 MOU provided that it would subcontract the "work share" (as

4  defined therein) to Wamar after The Project was awarded to Thales Avionics.  The work share

5  included, among other things, establishing and operating The Dubai Centers, repair of IFE systems

6  equipment, logistical services, delivering spare parts and consumables to Thales Avionics'

7  customers, and developing and marketing advanced IFE systems and related technology at The

8  Dubai Centers.

9      50.    Due to minor changes in The Project, after entering into the Emirates 2012 MOU,

10  Wamar and Thales Avionics discussed entering into a second agreement to confirm Thales

11  Avionics' intent to select Wamar as the sole subcontractor for The Project.

12      51.    Accordingly, on January 14, 2013, Wamar and Thales Avionics entered into a

13  binding Letter of Intent (hereinafter referred to as the "January 2013 LOI") confirming that Thales

14  Avionics would select Wamar as the sole subcontractor for The Project as initially expressed in

15  the Emirates 2012 MOU. A true and correct copy is attached hereto as Exhibit 1.

16      52.    Thales knew that Wamar and its senior management had the resources, expertise,

17  personnel and personal relationships to obtain business with Emirates and other airlines and to

18  establish and operate The Dubai Centers. Therefore, Thales Avionics and Thales S.A. induced

19  and used Wamar and its senior management to establish The Dubai Centers using Wamar's money

20  and resources.  Wamar was willing to spend the time and money necessary to establish The Dubai

21  Centers in reliance upon representations from Thales Avionics, Thales S.A. that Wamar would be

22  qualified as a KIP and operation of The Dubai Centers would be subcontracted to Wamar.  Those

23  representations turned out to be false.

24      53.    The January 2013 LOI was a binding agreement subject to only two conditions

25  subsequent: 1) that Emirates select Thales Avionics as sole supplier for IFE systems, support

26  services and connectivity technology for (50) B777X aircraft and/or (32) A380 aircraft; and 2) that

27  Wamar and Thales Avionics reach mutual written agreement on subcontracting terms and

28  conditions, in accordance with the principles set out in the Emirates 2012 MOU. If Emirates were

1   to select Thales Avionics for only one fleet of aircraft, then the subcontract agreement would be

2   adjusted accordingly. As more thoroughly described below, both conditions subsequent were fully

3   performed by Wamar and/or excused from further performance by virtue of Thales Avionics' and

4   Thales S.A.'s arbitrary and bad faith determination that Wamar did not satisfy Thales' arbitrary

5   and illusory internal KIP requirements. This determination was done in bad faith by Thales S.A.

6   with the sole objective to deprive Wamar of the benefits of the contract, keeping the benefits for

7   Thales.

8          54.    In late 2016, while Wamar was aggressively working with Thales around the clock

9   to obtain the Emirates aircraft contract, the parties continued negotiating their mutual written

10  agreement which would memorialize the terms and conditions set out in the January 2013 LOI and

11  the Emirates 2012 MOU.  This mutual written agreement was stylized as the Service Level

12  Agreement (hereinafter referred to as "SLA").  The SLA further confirmed the relationship

13  between Thales Avionics and Wamar as contractor and subcontractor for The Dubai Centers. At

14  the same time, on September 21, 2016, Thales, as a result of Wamar's efforts, had won the award

15  for installation of IFE systems and connectivity technology services on (150) B777X aircraft from

16  Emirates, valued at approximately $975M plus, with actual delivery of the aircraft to Emirates

17  scheduled to begin in December 2019 or early 2020, and is positioned to win the A380 aircraft

18  contract (up to 65 aircraft) within the next couple of months.  The work on the A380 IFE systems

19  campaign with Emirates has been ongoing non-stop for the past five years and is expected to be

20  awarded by the end of 2019 due to landing right issues being worked out between the U.A.E. and

21  the French DGA (civil aviation).

22         55.    Although Wamar has secured the award for all (150) B777X aircraft, Thales must

23  still perform to Emirates expectations.  Currently, the contract awarded to Thales is for (50)

24  B777X aircraft, of which (20) are firm and (30) are options.  In the aviation industry this is a

25  standard practice.  Unless Thales fails to perform as promised, Emirates has, in effect with this

26  contract, awarded all (150) B777X aircraft to Thales.

27         56.    Making an award with only (50) aircraft with (20) aircraft firm is to ensure that

28  Thales makes the necessary developments specified in the statement of work and uses a $19.5M

upfront payment from Emirates in that regard. Upon delivery of the proposed IFE system per agreed specifications on December 19, 2018 and after Emirates approves the proposed new innovation IFE system, the next (30) B777X aircraft will then be confirmed as firm orders. The commitment for the next (30) "option" B777X aircraft will actually be made and must be made before delivery of the first B777X with the new Thales IFE system to Boeing for installation. With the delivery sequence given by Boeing, the first aircraft delivery to Emirates is currently targeted for end of 2019 or early 2020.

57.     The next (100) B777X aircraft will automatically be awarded to Thales as Boeing needs at least 37 months advance notice to change any IFE systems supplier. The work behind integration and certification of an IFE system is incredibly complex, extensive and expensive. It basically requires re-wiring an aircraft to implement the IFE system, which is a major undertaking. With this in mind, the contract for the first (50) B777X aircraft is essentially the contract for the whole fleet of (150) B777X aircraft awarded…unless of course, Thales bungles the project completely and Emirates is forced to pull the plug on Thales.

58.     Accordingly, Wamar has fully performed its obligation to deliver an award to Thales for IFE system installation on (150) B777X Emirates aircraft and has earned its fees.

59.     Among other things, The Dubai Centers will be used to install and repair IFE systems, provide logistics services, deliver spare parts and consumables to multiple airline companies, and develop and market advanced IFE systems and related technology. Although the Emirates 2012 MOU provides that Thales Avionics would subcontract the work share to Wamar after it was awarded The Project, Thales Avionics and Thales S.A. demanded that Wamar perform some of the work share prior to the award of The Project, even though the parties were still finalizing the SLA and Thales was still withholding KIP approval from Wamar. In this regard, Wamar was required by Thales to prepare, arrange and facilitate everything so that immediately upon receipt of the KIP award, it could open a dedicated repair and innovation center with turn-key facility services located next to Emirates' Engineering Headquarters in Dubai, while accommodating a full IFE system and connectivity lab as well as a media processing workshop. Further, Thales required Wamar to hire and develop an operations organization, obtain

11

1  certification from the appropriate Civil Aviation Authorities, secure all required governmental

2  permits, and build out office space to host Thales Avionics' employees. Wamar was induced to,

3  and in fact, spent millions of dollars to set up The Dubai Centers by virtue of Thales S.A.'s, Thales

4  Avionics' continual fraudulent misrepresentations that Wamar would soon be approved as a KIP.

5  At the same time that Thales Avionics and Thales S.A. were demanding expedited work from

6  Wamar, behind the scenes Thales S.A. was actively manipulating the approval process of Wamar

7  as a KIP. Thales S.A.'s machinations assured that the sham KIP re-qualification process was

8  dragged out until after Wamar had won The Project and had secured the space for The Dubai

9  Centers for Thales Avionics, thus inducing Wamar to continue performing and continue spending

10  its own money.

11      60.   As will be discussed fully below, Thales S.A. not only intentionally delayed

12  Wamar's KIP approval process to assure The Project was awarded before the promised impending

13  KIP approval, but later, after Wamar had secured several valuable contracts for Thales Avionics,

14  Thales S.A. unreasonably, in bad faith and without notice, explanation, or good cause, executed its

15  plan and refused to approve Wamar as a KIP, which became the excuse for Thales Avionics not to

16  sign the SLA, or pay Wamar for the contracts Wamar had already delivered, or subcontract

17  operation of The Dubai Centers to Wamar.

18      61.   The SLA set out the compensation Wamar would earn for operating The Dubai

19  Centers, and a process for selling the facility to Thales Avionics sooner.  Thales showed Wamar

20  senior management a model demonstrating the profits Wamar could expect to earn over 26 years,

21  promising that either Wamar would operate The Dubai Centers for that time period or that any

22  possible and actually intended earlier purchase of the facility by Thales from Wamar would

23  provide equivalent value.

24      62.   Wamar and Thales Avionics agreed that Wamar was also to be paid a 6.4% royalty

25  (hereinafter referred to as the "KIP Royalty") fee of the total value of contracts for installation of

26  IFE systems on Emirates aircraft that Wamar delivered for Thales Avionics (and showed Wamar

27  senior management the calculations of the royalty). However, for reasons described in the

28  paragraphs below, Thales Avionics refused to put the KIP Royalty obligation into the SLA

1  directly, or into any written document for that matter. Nevertheless, Wamar has documentary

2  proof of the 6.4% royalty.

3      63.     Wamar's principal is also the sole owner of TABA, a company that consults and

4  operates as a Business Advisor in the aviation industry.  Several of Thales Group's Middle Eastern

5  companies contract with TABA to have Wamar senior management operate as a Business Advisor

6  through TABA, providing consulting services regarding obtaining airline contracts for Thales

7  Avionics. Of particular interest, TABA has multiple consultancy agreements with Thales

8  AMEWA, an operating company in the Thales Group. Under these agreements, Wamar senior

9  management operates as a Business Advisor to Thales AMEWA and is to be compensated by (1)

10 consulting fees that are outlined in the consultancy agreements, and (2) a KIP Royalty that Thales

11 S.A. will not allow to be put into a written document.  For example, in addition to any fees

12 described in the consultancy agreements regarding Turkish Airlines, Qatar Airways and Kuwait

13 Airways, TABA is entitled to a 5% KIP Royalty fee on the value of IFE systems contracts TABA

14 procures for Thales AMEWA with those particular airlines.

15     64.     Unknown to Wamar senior management until recently, but known to Thales and

16 Budin at all times, hiring TABA as a business advisor and Wamar for its services is a violation of

17 French and US laws.  In fact, the violations of law are so serious that Thales' head of compliance

18 resigned rather than be made a scapegoat for the violations.

19     65.     Although Wamar and TABA are separate companies, and they perform different

20 services for their respective clients, Thales Avionics, Thales and Budin did not want to show in

21 writing that in connection with pursuing business from Emirates, a company owned by Wamar

22 senior management (Wamar) would receive a 6.4% KIP Royalty fee from Thales Avionics, while

23 another company owned by Wamar senior management (TABA) would receive a separate

24 consultant fee from Thales AMEWA as a Business Advisor. Similarly, with respect to The

25 Project, Thales Avionics and Thales S.A. wanted to conceal that Wamar was entitled to profit

26 from operating The Dubai Centers and also entitled to 6.4% KIP Royalty fee of the value of IFE

27 systems contracts it was awarded from Emirates.

28     66.     The obligation for the KIP Royalty is part of the January 2013 LOI and SLA terms

193117

13

COMPLAINT

and, although the KIP Royalty is not a term expressed in the SLA because Thales wanted to keep the arrangement below the radar of any governmental regulatory agencies, there is documentary evidence that the KIP Royalty is a mutual written agreement between Thales and Wamar. Relying on the executed January 2013 LOI agreement, terms in the SLA and the KIP Royalty obligation, Wamar engaged in significant activity at Thales' insistence and expended substantial resources working with Emirates, U.A.E. governmental agencies, and other third parties for the exclusive benefit of Thales and Thales Avionics. As a direct result of Wamar's efforts, including Wamar senior management's personal relationships with executives of Emirates, on September 21, 2016, Thales Avionics was awarded a $975M contract for the installation of IFE systems on (150) B777X aircraft, in addition to fees related to IFE connectivity services and Big Data estimated at approximately $70M, ordered by Thales for the Emirates projects, upon delivery as set forth above. Accordingly, the first condition of the January 2013 LOI was satisfied.

67. As will be discussed below in Paragraphs 72 to 74 of this Complaint, by August 2017, Thales Avionics and Wamar had reached mutual written agreement when they finalized the language of the SLA. Accordingly, the second and final condition of the January 2013 LOI was also satisfied.

68. Wamar, Thales Avionics and Thales S.A. are all sophisticated parties. When Thales S.A. and Thales Avionics demanded that The Dubai Centers and the Wamar branch in Dubai be established by Wamar, the parties understood that Wamar was required to start the process immediately without waiting for final KIP re-qualification approval, which was supposed to be a merely ministerial process, and which both Thales entities had already assured Wamar would be approved. Accordingly, in reliance upon those false representations, Wamar immediately commenced performance of the work share that was to be subcontracted pursuant to the SLA after the award of The Project and upon execution of the SLA. Wamar kept Thales informed of its activities and Thales insisted upon Wamar completing certain tasks prior to the promised KIP award. Wamar established a branch office space and committed to a long-term lease for The Dubai Centers. As set out in the SLA and demanded by Thales, Wamar established and prepared a space for fully functional turn-key The Dubai Centers in the Dubai Airport Free Zone

193117

14

1  for the benefit of Thales Avionics. By September 1, 2017, a lease agreement for The Dubai

2  Centers was in place.

3         69.    The SLA also provided that Thales Avionics would pay Wamar a non-recurring fee

4  of $5.75M as partial compensation for the costs incurred by Wamar, including the first year's rent

5  for The Dubai Centers. Of that amount, $1.1 would be due upon signature of the SLA and

6  commencement of operations would institute payments of the additional $4.65M. Instead, as

7  discussed below, Thales S.A. manipulated and delayed the KIP re-qualification process until after

8  Wamar had secured The Project, while all along continuing to assure Wamar that approval was on

9  its way.  Suddenly, and without any notice or cause, Thales S.A. consummated its plan and

10  refused, in bad faith, to re-designate Wamar as a KIP, and as a result Thales Avionics used that as

11  an excuse to refuse to sign the SLA and subcontract The Dubai Centers to Wamar. Thus, Thales

12  Avionics misappropriated The Dubai Centers opportunity for itself.  As a direct result, Wamar has

13  incurred more than $15M over seven years in out-of-pocket expenses.

14         70.    On November 30, 2017, Thales Avionics sent a letter to Wamar executives

15  confirming, once again, its intention to select Wamar to establish and operate The Dubai Centers.

16  Thales Avionics also reiterated its intention to solely sub-contract Wamar to operate the facility to

17  support Thales Avionics' performance under its current and/or future agreements with airline

18  companies in the Middle East region, including Emirates.

19         71.    The SLA was negotiated between Wamar and Thales Avionics, starting in mid-

20  2016, with the final version completed in 2017. Thales S.A. personnel participated directly and

21  extensively in the negotiations.  Even while the SLA terms were being finalized, in reliance upon

22  Thales S.A.'s representations that it intended to approve Wamar as a KIP and pay the KIP Royalty

23  on the secured contracts, Wamar was expending considerable resources to set up The Dubai

24  Centers in accordance with plans developed by Wamar and Thales.

25         72.    In August 2017, the SLA final terms were agreed upon. Harald Zirngibl, Contract

26  Manager for Wamar and Geraldine Gros, Contract Manager, for Thales Avionics met face to face

27  in Laguna Beach, California to finalize the last trivial remaining items still being discussed in the

28  SLA.

193117

15

COMPLAINT

73.     By November 2017, the SLA was ready for final signature.  On December 5, 6, and 7, 2017, Wamar senior management, together with Wamar and TABA staff from Germany, Jordan, the U.A.E and the U.S., met in Los Angeles with Jean-Christophe Rohard, Legal Manager for Thales AMEWA, and George Ermenidis from Thales' Dubai office who were ostensibly managing the KIP re-qualification process for Thales.  Wamar was led to believe that the purpose of the meeting was to clarify the reason for Thales' constant requests for additional documents required to finalize the KIP re-qualification process.  Although Mr. Ermenidis referenced ongoing review by Thales senior management in Dubai and in Paris, both he and Mr. Rohard encouraged Wamar to continue working, stating that they believed Wamar was approved as a KIP.

74.     By December 2017, even though Thales S.A. kept changing and increasing its document demands, (a) Wamar had provided all documents required to be re-qualified as a KIP, (b) The Dubai Centers had been established, (c) the premises for the facility was secured for Thales, (d) Emirates had awarded Thales Avionics a $975M plus contract for the installation of IFE systems on (150) B777X aircraft, plus additional technology services, and (e) Wamar had fully performed its obligations under the January 2013 LOI.  Thales Avionics, however, refused to perform its part of the contract.

75.     Although the SLA had not yet been executed, in November 2017, Emirates announced the purchase of a fleet of (40) Boeing 787 ("B787") aircraft. Immediately thereafter, Roger Daix, the Vice President of Thales S.A., asked Wamar to mobilize all of its resources to work on having Emirates select Thales Avionics to be the IFE system provider for those aircraft. In December 2017, Jean-Pierre Pourre, Project Manager for Thales, informed Wamar senior management that it had been arranged internally for Wamar to receive the agreed-upon KIP Royalty fee of 6.4% on the value of the contract, to be paid upon the award of (40) B787 aircraft. Furthermore, Roger Daix verbally informed Wamar senior management that Thales would arrange for TABA to receive compensation of $3M for its consulting services upon the award of the (40) B787 aircraft, in addition to the 6.4% KIP Royalty for Wamar.

76.     After working for a month without a contract, Wamar senior management inquired about the agreement and was told that it would be finalized by the end of December 2017 and

16

COMPLAINT

1   Wamar should continue pursuing the award of the forty (40) B787 aircraft.  In reliance upon

2   Thales' representations, Wamar continued to work.  To Wamar senior management's surprise,

3   however, on January 29, 2018, Roger Daix and Budin, informed Wamar that they had decided not

4   to add the (40) B787 aircraft to Wamar's agreement.  Nevertheless, Mr. Daix continued to assure

5   Wamar senior management that Thales Avionics would honor the agreement and encouraged it to

6   continue working.  Further, he instructed Wamar senior management to hire staff ASAP to start

7   the Dubai operation. Wamar senior management assured Thales that a few staff positions had been

8   filled with high caliber individuals who would meet and far exceed Thales' expectations. Actually,

9   Wamar has hired a Director of Media and Communication for five years (Dana Khalili), who met

10  with Thales executives on several occasions and they have approved and were impressed with her

11  appointment, as well as the hiring of the Head of Administration and Human Resources (Rola

12  Megdadi).

13       77.    Even as of the date this Complaint was filed, Thales continues to seek Wamar's

14  help in procuring the contract for the (40) B787 aircraft and Wamar continues to work to procure

15  the contract for Thales Avionics.  The total expected value of the (40) B787 contract is $200M.  If

16  the contract is awarded, Wamar's KIP Royalty of 6.4% will be approximately $12.8M for this

17  additional work, as well as $3M in consulting service fees for TABA, and further fees to Wamar if

18  Emirates orders additional technology services. Given the Thales Group's history of breaching its

19  agreements and not paying Wamar what it has earned, Wamar respectfully requests that the Court

20  grant declaratory relief and an order that if the contract is awarded to a Thales Group company,

21  Thales Avionics must pay Wamar's KIP Royalty and TABA's consulting service fees.

22       78.    Wamar had been qualified by Thales Avionics as a world-wide KIP since 2012, but

23  the KIP qualification expires every 3 years and therefore every KIP needs to be re-qualified on a

24  periodic basis. As a worldwide KIP for Thales, Wamar and its senior management had increasing

25  demands made by various Thales Group companies, eventually dominating the time and resources

26  of Wamar senior management and that of Wamar's staff.  Thales Group companies used Wamar in

27  several countries where Wamar senior management had personal relationships with the

28  international Heads-of-State as a result of Wamar supplying IFE systems for their personal aircraft

1  and other related military, defense and aerospace projects. The exorbitant demands by Thales

2  consumed almost all of the time of Wamar and its senior management to the detriment of Wamar's

3  other business.

4      79.  As the SLA required Wamar to be a KIP in order to operate The Dubai Centers and

5  Wamar's KIP certification approval had naturally expired in 2015, Wamar needed to be re-

6  qualified.  This re-qualification process is typically an administrative-level process to update

7  documents and paperwork on the company.  As such, Thales Avionics requested several

8  documents from Wamar to update its file and Wamar timely provided every document as

9  requested.  Even though Thales frequently demanded new documents, Wamar consistently and in

10  good faith completed all requirements to fulfill and meet the KIP qualifications.

11      80.  The KIP re-qualification process, however, was a sham. Thales S.A. continued to

12  postpone Wamar's KIP re-qualification, constantly increasing the requirements and the need for

13  more documentation. Each time Wamar supplied the documents requested by Thales S.A., more

14  documents were requested.

15      81.  During the second week of January 2018, Wamar senior management met with the

16  CEO of Thales Middle East (Roger Daix) and was assured that the KIP process was approved, the

17  SLA would be executed, and implementation of work at The Dubai Centers would begin by no

18  later than February 28, 2018.  Mr. Daix also requested Wamar senior management to accelerate

19  the appointment of senior staff and be ready to move to Dubai to start the operation of both

20  centers.

21      82.  Near the end of January, 2018, Jean Pierre Pourre assured Harald Zirngibl of

22  Wamar that the SLA would be signed, and the only reason it had not already been signed was

23  because of facility audits Thales wanted to conduct in Wamar's offices. The audits were in fact

24  conducted in the Simi Valley, CA and San Diego, CA offices.

25      83.  However, after Thales S.A. refused to certify Wamar's KIP status, Thales Avionics

26  used that as its excuse for refusing to execute the SLA.  Instead, in January, Wamar senior

27  management was summoned by Roger Daix for a private meeting in Paris.  This request for a

28  private meeting was unusual and unexpected because although Thales S.A. personnel had

1  participated in negotiating the SLA, Wamar senior management had been advised the SLA was

2  already approved as agreed between Wamar and Thales Avionics.

3       84.    On January 29, 2018, Roger Daix and Budin met with Wamar senior management

4  informing them that Thales S.A. would never approve Wamar as a KIP for The Dubai Centers.

5  They further informed Wamar senior management that as a result of an external audit, Thales

6  Avionics would never execute the SLA and that although Thales agreed compensation was due to

7  Wamar, they (Thales) needed to devise a way to pay.

8       85.    Wamar was unaware that Thales had violated U.S. and French laws and was

9  attempting to cover up those violations by refusing to sign the SLA (but only after extracting the

10  full benefit of Wamar's efforts).

11       86.    On information and belief, Budin is a principal architect of the schemes to (a) have

12  Wamar represent foreign Thales entities in negotiations for contracts that would ultimately be

13  signed by and benefit Thales Avionics, a California corporation, and (b) engage in a money-

14  laundering spare parts distributorship ploy to conceal payment obligations to Wamar.  The

15  purpose of these schemes was to conceal Thales' violations of internal Thales policies and

16  potential violations of U.S. and French laws.

17       87.    Mr. Daix expressed a fatal concern that TABA was already a Business Advisor for

18  Thales AMEWA regarding Emirates and that accordingly, Thales S.A. would never approve

19  Wamar as a KIP. Even though Wamar and TABA performed separate contractual obligations,

20  Wamar's principal was an owner of both entities and Thales S.A. did not want to make

21  extensively large payments to a single person, or entities owned by the same person.  Such an

22  arrangement, they claimed, could subject Thales S.A. and Thales Avionics to uncomfortable

23  scrutiny by various government oversight authorities.  Accordingly, Thales S.A. would not allow

24  Wamar or its principal to be a KIP, to enter into the already finalized SLA, or to be compensated

25  for the valuable work Wamar had already performed for Thales Avionics.

26       88.    In this way, by the end of January 2018, Thales had verbally ended its relationship

27  with Wamar.  But Thales still required Wamar's services, so Thales continued to engage with

28  Wamar's senior management to secure even more contracts.  Indeed, Thales continued to seek out

1  Wamar senior management's advice and influence, and continues to do so even up to the time of

2  filing this Complaint.  However, Thales executives demanded that Wamar senior management

3  operate "under the radar" to avoid Thales' internal legal department's scrutiny and possible

4  scrutiny by agencies of the U.S. and other governments.  To avoid that unwanted scrutiny, Thales

5  executives instructed Wamar senior management not to contact them using Wamar's (a U.S.

6  company) e-mail address.  To further obscure Thales' ongoing business relations Wamar and its

7  senior management, Thales required Wamar's principal to use a special phone with unknown

8  caller ID when he needs to give updates on the contracts Wamar is working on.  The phone in

9  question could not show any caller ID that could be traced back to Wamar's principal, as the

10  Thales executives did not want their phone system capturing any evidence that they continued to

11  use the services of Wamar.

12       89.     Mr. Daix's contrived excuse for pulling out of its obligations to Wamar was that

13  Panasonic had recently been charged by the U.S. Department of Justice with violations of the

14  Foreign Corrupt Practices Act and by other governments for similar violations under their

15  respective laws.  Mr. Daix asserted that approving a Wamar KIP Royalty transaction would be

16  risky in light of the Panasonic case because one person earning substantial amounts of money was

17  apparently a red flag to governmental agencies on the lookout for corruption and bribery.  If

18  Thales is found in violation of such laws, it could be sanctioned, potentially costing it billions in

19  fines and lost business.

20       90.     But Thales knows that all the transactions with TABA, Wamar, and its senior

21  management are legitimate on Wamar's and TABA's end, and that Wamar and TABA have fully

22  performed.  So this excuse is just a transparent ruse to bolster Thales' profits without being kicked

23  out of the IFE systems market in the Middle East and hopefully avoiding governmental scrutiny.

24  Thales acknowledges it owes substantial fees to Wamar, but Thales refuses to pay, leaving Wamar

25  with no choice but to sue Thales for its fees in a court of law.  Wamar senior management assured

26  both Mr. Roger Daix, Head of Thales Middle East, and Mr. Bernard Roux, President of Thales

27  UAE, that Wamar has worked in good faith, never violated and will never violate US law or any

28  domestic laws of any jurisdiction and/or international law, abides by good business practices and

193117

1 | is in conformity with all US and international laws pertaining to anti-corruption acts. In addition,

2 | Wamar is TRACE certified, so there is nothing to be concerned with.

3 | 91.     In fact, all of the business terms agreed to between Thales/Wamar and

4 | Thales/TABA, in the various contracts referred to herein, were performed by Wamar and TABA

5 | in full compliance with all laws. Accordingly, any "concerns" expressed by Thales are either pure

6 | fiction, or are related back to Thales' own malfeasance, and are being used in bad faith to avoid

7 | paying Wamar and TABA for their services, which have greatly benefitted Thales by securing

8 | contracts and business opportunities in excess of $2B in contracts that Thales could not secure on

9 | its own.

10 | 92.     Furthermore, even though Wamar had (a) fully satisfied its obligations under the

11 | Emirates 2012 MOU and the January 2013 LOI, (b) agreed to final terms on the SLA, and (c)

12 | secured valuable contracts for Thales Avionics worth in excess of $2B, Thales S.A. interfered with

13 | Wamar's contract with Thales Avionics by refusing to qualify Wamar as a KIP. As a direct result

14 | of Thales S.A.'s interference, Thales Avionics refuses to execute the SLA with Wamar and refuses

15 | to pay Wamar the fees it has already earned. Additionally, had (1) Thales S.A. not wrongly

16 | refused to confirm Wamar's KIP status, and (2) Thales Avionics not used that as an excuse not to

17 | sign the SLA, operation of The Dubai Centers would have been subcontracted to Wamar

18 | generating over $150M in profit to Wamar.

19 | 93.     The initial term of the SLA was 10 years with a 2-year option, but Thales assured

20 | Wamar senior management that the true term of the SLA would be 26 years.  It is the business

21 | practice in Dubai that you cannot secure a lease longer than 10 years, but Thales explained that it

22 | would renew that lease for up to a period of 26 years by showing Wamar senior management a

23 | financial projection with a 26-year term and represented that Thales would honor that

24 | commitment.  Wamar and Thales Avionics contemplated that either Wamar would continue to

25 | operate The Dubai Centers for the entire term or Thales Avionics would purchase the facility after

26 | a period of 5-6 years, for a mutually agreed upon amount but not less than the amount of profit

27 | Wamar would have earned from the date of purchase through the end of the 26-year term, which

28 | was $150M plus, and potentially much more as The Dubai Centers would service other airline

1   customers of Thales as well.

2       94.     Under the January 2013 LOI and the terms as set out in the SLA, Thales Avionics

3   will owe Wamar a KIP Royalty fee in the amount of approximately $25.6M plus, aside from the

4   subcontract work, for negotiating the (65) A380 IFE systems, upon award and delivery as set forth

5   above. The total contract value in negotiations for the IFE systems alone, exclusive of additional

6   technology services, is approximately $400M. In addition, Wamar will be entitled to fees obtained

7   by technology services ordered on this fleet of aircraft, resulting in a fee subject to proof.

8       95.     Under the January 2013 LOI and the terms as set out in the SLA, Thales Avionics

9   owes Wamar a KIP Royalty fee in the amount of approximately $70M plus, aside from

10  subcontract work, for the award of (150) B777X aircraft to install IFE systems and additional

11  technology services ordered by Thales upon award and delivery as set forth above.  The total

12  contract value is approximately $975M plus, plus the added fees for technology services ordered

13  by Thales.

14      96.     Finally, under the SLA, Thales Avionics was obligated to pay Wamar a non-

15  recurring fee of $5.75M upon the setup of specific events. Of that amount, $1.1 would be due

16  upon signature of the SLA and commencement of operations would institute payments of the

17  additional $4.65M

18      97.     Consistent with the directives and interference of Thales S.A., Thales Avionics has

19  continued to refuse to execute the finalized SLA.

20      98.     Consistent with the directives and interference of Thales S.A., Thales Avionics has

21  refused to pay any compensation to Wamar for work it has completed for the benefit of Thales

22  Avionics under the Emirates 2012 MOU, the January 2013 LOI and the terms of the SLA,

23  including the payment of the KIP Royalty.

24      99.     Wamar senior management, senior executive staff of Wamar and regional

25  managers across the globe have invested 7 years and millions of dollars in developing relations

26  with large and well-known airline companies to build up a credible reputation for the Thales

27  Group. Wamar senior management and many of Wamar's staff traveled to Dubai on a bi-weekly

28  basis to advise Emirates officials to select Thales Group and contract over $1B of IFE systems

193117

1  business for Thales Group, with another $1B to be awarded on additional aircraft contracts.

2  Further, in reliance upon representations by Thales Avionics and Thales S.A., Wamar senior

3  management has focused on procuring business for Thales Group rather than pursuing other

4  opportunities, resulting in lost income and lost opportunities elsewhere.

5       100.   As a direct result of Wamar's efforts, Thales Avionics has finally procured valuable

6  contracts with Emirates worth over $1B, with another $1B to be awarded, plus over hundreds of

7  millions of dollars with other clients in the area, but now Thales refuses to pay Wamar the fees it

8  has earned.

9  ***The Etihad Railroad Project***

10       101.   In 2011, Thales SAL approached Wamar to assist Thales SAL on acquiring a

11  lucrative contract for the Etihad Railroad project. The railway network was intended to link freight

12  facilities and passenger stations and would form a vital link to the GCC railway network.

13       102.   In February 2014, Thales SAL and Wamar entered into a binding Memorandum of

14  Understanding (hereinafter referred to as "Etihad Rail MOU") regarding Etihad Rail Company's

15  (hereinafter referred to as "Etihad") intention to select a company for the design, build-out and

16  support systems for the Etihad Rail Project.

17       103.   The Etihad Rail MOU states that if Thales Transportation System is awarded the

18  Etihad Rail Project contract, Thales SAL will act as prime contractor and Wamar will act as

19  subcontractor for their respective work described in the Etihad Rail MOU. Wamar agreed to form

20  a working group with Thales SAL to provide a best and final offer before April 1, 2014.

21       104.   The Etihad Rail MOU sets forth the scope of work (and source of income) of the

22  subcontractor, Wamar, once the Etihad Rail Project was won:

23      a.     Open four temporary facilities;

24      b.     Supply 79 rail vehicles;

25      c.     Open GSM-R towers including supply, transportation, and installation;

26      d.     Open three telecom and signaling shelters including supply, transportation and

27             installation; and

28      e.     Provide security for the temporary facilities and the signaling shelters.

105.    Subject to these provisions outlined in the Etihad Rail MOU, Thales SAL induced Wamar to perform under the Etihad Rail MOU and as a direct result thereof, Wamar spent approximately $4M performing the specified requirements at Thales' request, including opening an office space in the Meydan Hotel and Resort in Dubai and hiring experts to assist in the technological aspects of the rail project, which was estimated at a total contract value of $434M for Thales SAL.

106.    The Etihad Rail Project was divided into three stages. For the first stage, Thales SAL made an offer on its own in 2012 but, not surprisingly, unsuccessful in obtaining the contract and therefore Stage 1 is not a subject of this Complaint. The second stage was planned to connect Qatar, Kuwait, and Saudi Arabia on one side and Oman on the other. Thales SAL planned to bid on the contract to provide a rail signaling and integration system for the second stage. The third stage would connect Dubai and Northern Emirates. Thales SAL wrongly terminated Wamar services prior to award so the third stage is not a subject of this complaint.

107.    Not long after Thales failed in getting the Stage 1 project, Thales SAL and Wamar entered into a Consultancy Services Agreement dated June 22, 2014 (hereinafter referred to as the "Etihad Rail agreement") regarding Phase 2 of the rail project. Under this agreement, Thales SAL contracted Wamar to promote Thales SAL as prime contractor for the Etihad Rail Project. Indeed, due to Wamar's efforts, Thales was placed to be the number one shortlisted company to be awarded the contract for this project. Upon award of the $434M contract to Thales SAL, Wamar was to be entitled to approximately $4.65M as its consultant fee. Thales also owed Wamar its KIP Royalty of 6%, which would be about $26M on the total value of the contract which was approximately $434M.

108.    At Thales' urging, Wamar expended substantial time and considerable amounts of its own money to fulfill its responsibilities set out in the Etihad Rail agreement. After months preparing and presenting several iterations of rail proposals for Thales SAL, a revised and final bid proposal was sent to Thales SAL on September 8, 2014. The proposal was detailed into seven packages, which included a supply of vehicles, shelters, communication towers and life support for all stations along the length of the rail project. Wamar was induced to perform these

1  responsibilities by Thales SAL in order to receive its KIP Royalty.

2         109.    Due to Wamar's extensive efforts, Thales SAL was announced as the number one

3  bidder for the Etihad Rail Project.  Despite this, on June 30, 2015 (six months prior to the

4  expiration of the Etihad Rail agreement), for no reason, Thales SAL terminated Wamar's contract

5  to work on the rail project.

6         110.    Rather than have Thales SAL pay Wamar what Wamar had earned, Thales S.A.

7  took advantage of the fact that Wamar and TABA had short-term agreements with other Thales

8  Group entities and threatened Wamar senior management that if Wamar did not walk away from

9  the Etihad Rail Agreement, then none of Wamar's or TABA's other agreements with Thales

10  Group entities would be renewed and Wamar and TABA would lose those deals.  In particular,

11  Thales S.A. threatened to terminate Wamar from the Emirates Project if it did not forego all

12  payments due under the Etihad Rail agreement if and when awarded.

13         111.    Thales SAL handed Wamar senior management a termination notice at Thales'

14  offices on June 30, 2015 on the Etihad Rail agreement effective immediately.  Notice was served

15  by Mr. Marc Duflot, President of Thales Middle East at the time. The letter noted that the

16  termination was "for convenience."

17         112.    Wamar could not afford to lose its other contracts and in particular, the Emirates

18  Project.  Based on the belief that Thales SAL would cause Wamar severe financial difficulty if

19  Wamar sought to be paid for its work it had performed on the Etihad Rail agreement and on the

20  representation that other contracts would be honored if Wamar walked away from Etihad, Wamar

21  had no choice but to acknowledge and submit to the termination.

22         113.    Wamar fully performed its obligations under the Etihad Rail agreement and was

23  then wrongfully terminated on June 30, 2015.  As a direct result, Thales SAL owes Wamar:

24        a.    $4M USD out of pocket costs;

25        b.    $4.65M consultancy fee; and

26        c.    $26M KIP Royalty.

27  Of which, *none* have been paid to Wamar.

28

*TABA'S Airline Consultancy Agreements*

        *A.  Qatar Airways A320 Consultancy Services Agreement*

114.    In 2014, Qatar Airways was soliciting proposals to provide IFE systems for (50) A320 aircraft, an opportunity Thales SAL wanted to win.  Recognizing Wamar's value and expertise, Thales SAL asked Wamar senior management to help it obtain the Qatar Airways business.  Wamar originally agreed that it would be contracted to consult with executives from Qatar Airways to obtain the IFE systems contract for the (50) A320 aircraft.  Upon award, Wamar was owed a KIP Royalty of 5% of the total contract. However in an effort to avoid scrutiny by the United States and other regulatory agencies, Thales advised Wamar senior management to consult through TABA (a Jordanian Company) and enter into contractual obligations with Thales SAL (a Lebanese company). Although Thales Avionics, not Thales SAL, would enter into the agreements with Qatar Airways, Thales S.A. required TABA to sign the Consultancy Services Agreements with Thales SAL in an effort to evade US scrutiny and to be able to deny that Thales Avionics had ever made that commitment to TABA.

115.    TABA was successful in obtaining the notice of award for Thales Avionics, which in fact was signed by Thales Avionics.

116.    After Thales delivered approximately (7-10) ship sets of IFE system for the A320 aircraft, Qatar refused to accept all (50) A320 aircraft due to engine issues. However, these aircraft with Thales IFE system were delivered to customers such as Lufthansa and others. Wamar's contract fees for the Qatar selection of (50) A320 aircraft was agreed as $3.8M; therefore, the total KIP Royalty fees on the actual delivered aircraft are approximately $0.8M. Although, Wamar fully performed under the agreement, neither Thales SAL nor Thales Avionics have paid TABA and/or Wamar.

        *B.  Qatar Airways A350 Consultancy Services Agreement*

117.    Thales Avionics had independently managed to obtain a contract with Qatar Airways for (80) A350 aircraft but Thales was not sophisticated enough to properly perform to Qatar Airways' expectations on such a large contract.  Qatar Airways quickly became dissatisfied with Thales' performance and cancelled the contract after delivery of (17) A350 aircraft.

Desperate to salvage the lucrative Qatar Airways A350 business, Thales SAL contacted Wamar senior management and asked Wamar to help Thales Avionics in reinstating the contract with Qatar Airways.  Wamar senior management, operating through Wamar and TABA, agreed to assist Thales yet again under the condition that TABA and Thales enter into a consultancy agreement.

118.    Wamar senior management agreed to assist Thales Avionics on the Qatar A350 project, which was valued at a total value of approximately $297M. As compensation for consulting services, a total fee of $16M was earned, of which $10M was to be paid outright to TABA while the remaining $6M was to be paid to Wamar pursuant to a KIP Royalty. The $16M in compensation was divided into separate payments for each of four (4) contracts expected to be signed between Thales and Qatar Airways (wherein described as projects 5, 6, 7 & 8).

119.    Wamar senior management, operating through Wamar and TABA immediately engaged Qatar Airways as a Business Advisor for Thales.  Wamar senior management succeeded in salvaging the deal for (80) A350 aircraft that Thales Avionics had lost. In the meantime, without notice, Thales Avionics changed its proposal structure with Qatar Airways.  Instead of presenting four (4) separate proposals as it had discussed with Wamar senior management, it aggregated the aircraft and presented one (1) proposal encompassing all of projects 5, 6, 7 & 8.

120.    Even though Wamar senior management reinstated the contract for (80) A350 aircraft, Thales' response to TABA's exceptional performance deceivingly manipulated the proposal system so it could use a technical and undisclosed loophole to avoid its obligations, instead of paying what it promised TABA.  Wamar senior management objected that Thales would submit one contract instead of four (4), but Mr. Marc Duflot President of Thales Middle East at the time, assured Wamar senior management that even though Thales would submit one contract, TABA would receive the full amount of $10M as a consulting fee plus $6M plus as KIP Royalty for Wamar.

121.    On March 16, 2017, Roger Daix informed Wamar senior management that Thales SAL would only pay €4M ($4.6M) of the $10M fee, plus a promise to pay $6M pursuant to a KIP Royalty to Wamar, an arrangement similar to the Kuwait distributorship arrangement discussed

193117

27

1  below.  The distributorship arrangement was a money-laundering scheme employed by Thales in

2  an attempt to avoid governmental scrutiny of its potential violations of law.

3       122.  Eventually, Thales SAL even backed out of the KIP Royalty arrangement and

4  required TABA to sign a settlement agreement accepting only €4M ($4.6M).  Once again, Thales

5  executives took advantage of the fact that Wamar and TABA had short-term agreements with

6  other Thales Group entities and threatened Wamar senior management that if TABA did not

7  immediately sign the settlement agreement, then none of TABA's or Wamar's other agreements

8  with Thales Group entities would be renewed and therefore those deals would be lost.

9       123.  Roger Daix justified reducing Wamar's and TABA's fee by pointing out that Thales

10  SAL had manipulated the contracting process with Qatar Airways to sign a single contract rather

11  than four (4) contracts for the four (4) separate Qatar Airways projects. By consolidating the bids,

12  even though the total contract value was still the same $297M, Thales SAL contends it had the

13  right to reduce Wamar's and TABA's fees.

14       124.  On July 19, 2017, Thales' executives Roger Daix, Pierre-Marie Durand (VP, COO,

15  Thales AMEWA) and Bernard Roux, President of Thales AMEWA, traveled to the US and met

16  with Wamar senior management at Wamar's facility in San Diego, CA. The Thales executives put

17  before Wamar's senior management three (3) consultancy services agreements between Thales

18  AMEWA and TABA covering new campaigns for Kuwait Airways, Qatar Airways and Emirates.

19  Those three agreements were a trap. They also handed Wamar senior management a settlement

20  agreement for the just-concluded Qatar Airways deal which provided for a settlement payment of

21  €4M ($4.6M), of which €2M ($2.3M) was to be paid immediately, while the other €2M ($2.3M)

22  would not be paid until delivery of the aircraft. The consultancy agreements were contingent upon

23  Wamar senior management signing the settlement agreement.  Thales paid the first €2M ($2.3M),

24  but even though aircraft have been delivered, Thales has refused to pay any part of the remaining

25  €2M ($2.3M).

26       125.  Wamar senior management was handed fully drafted contracts on a "take it or leave

27  it" basis.  The message from Thales was clear: sign on the dotted line right now or TABA's

28  current contracts with Thales regarding Kuwait, Qatar and Emirates would not be renewed.  The

193117

28

COMPLAINT

1    Thales executives knew that renewal of TABA's agreements for its various projects with Thales

2    was crucial to TABA and Wamar. Thales having knowledge that negotiating and finalizing

3    aviation contracts is a lengthy process, they intentionally offered TABA agreements with only

4    short term duration.  Thales then used that timing disconnect to extort TABA, which risked losing

5    its fee if a contract was not signed during the term of the agreement, even if TABA had negotiated

6    a final agreement subject only to signatures.  With no other option, Wamar senior management

7    signed the settlement agreement and the three consultancy services agreements in hopes of saving

8    its business opportunities with Thales Group and recouping the huge losses TABA/Wamar had

9    incurred during the previous six (6) years.

10        **C.   Emirates Consultancy Services Agreement**

11        126.    On July 19, 2017, after Wamar signed the Qatar settlement agreement, Thales

12   AMEWA and TABA entered into a Consultancy Services Agreement regarding several Emirates

13   projects (the "Emirates Agreement").  The Emirates Agreement is between TABA (Jordanian

14   company) and Thales AMEWA (Lebanese company).  However, it provides that the contracts

15   with Emirates will be entered into by Thales Avionics.  Even though Thales Avionics, a U.S.

16   company will be the beneficiary of the contracts, Thales S.A. required the consultancy services

17   agreements to be entered into between non-U.S. companies out of a desire to avoid scrutiny of its

18   consultancy services agreements by U.S. and other governmental agencies, and be able to deny

19   that it had ever made a KIP Royalty commitment to Wamar.

20        127.    The Emirates Agreement is between Thales AMEWA and TABA for TABA to

21   promote Thales Avionics to Emirates as the provider for several Emirates requests for proposals in

22   2017 and 2018. The identified projects are:

23        a.       Emirates Connectivity B777X (20 A/C)

24        b.       Emirates Connectivity B777X (30 A/C)

25        c.       Emirates IFE B777X batch 2 (100 A/C)

26        d.       Emirates Connectivity B777X batch 2 (100 A/C)

27        e.       Emirates Airlines IFE A380 (25 A/C)

28        f.       Emirates Connectivity IFE A380 (25 A/C)

1       g.     Big Data

2       h.     Etihad Airways IFE B777X (25 A/C)

3       i.     Etihad Airways Connectivity B777X (25 A/C)

4       128.   By the time the Emirates Agreement was signed, however, Wamar senior

5 management had, at the request of Roger Daix and Thales Avionics, already been working to

6 secure those projects for Thales Avionics, and in fact, had tentatively secured projects (a) and (b)

7 with a total contract value of $325M, subject to final signatures.

8       129.   The Emirates Agreement sets out a specific Professional Fee that is earned by

9 TABA for each project upon TABA successfully securing a contract for Thales Avionics.

10      130.   On September 21, 2016, contracts for projects (a) and (b) for installation of IFE

11 systems on (50) B777X aircraft were provisionally awarded to Thales Avionics with the Emirates

12 Agreement requiring Thales AMEWA to pay TABA a total consulting fee of approximately $3M

13 for that contract.  TABA has been paid a single progress payment of $0.21M.

14      131.   What the Emirates Agreement does not show however, is that Wamar was entitled

15 to a KIP Royalty fee equal to 6.4% of the contract value of those projects which is valued at

16 $325M, or approximately $20.8M, with additional options of connectivity and technology services

17 ordered by Emirates in an amount of approximately $80M plus, on which a KIP Royalty fee is

18 also owed to Wamar. Once again, in an effort to avoid governmental scrutiny, and be able to deny

19 that it had ever made that commitment to Wamar, Thales S.A. would not put that fee in writing,

20 but had disclosed the fee calculation that would be paid when earned. Although Thales has

21 attempted to make its contractual relations convoluted and opaque to avoid scrutiny and to be able

22 to deny liability, Wamar has documentary evidence of the KIP Royalty obligation and its

23 calculation on the agreements.

24      132.   Wamar has also been assured that as soon as December 2019 but not later than

25 2020, assuming Thales performs competently on the first batch of (20) aircraft, Emirates will

26 deliver project (c) to Thales Avionics. The total contract value for installation of IFE systems on

27 an additional (100) B777X aircraft, exclusive of additional technology services, is approximately

28 $650M. In addition Wamar will be entitled to fees obtained by technology services ordered by

1    Emirates on this fleet of aircraft, generating fees in an amount of approximately $70M, subject to

2    proof.  Upon delivery of the written contracts, Wamar will be entitled to a KIP Royalty equal to

3    6.4% of the contract value of that project, or approximately $41.6M, in addition to the technology

4    services fees.

5         133.    Additionally, Wamar has been working on delivering projects (e) and (f) to Thales

6    Avionics. The total contract value for installation of IFE systems on (65) A380 aircraft is

7    approximately $400M. If awarded, Wamar is entitled to a 6.4% KIP Royalty fee of the total

8    contract value, or approximately $25.6M and any fees generating from technology services

9    ordered by Emirates, in addition to TABA's $3M consultant fee.

10        134.    Although, Wamar has fully performed under the Emirates Agreement, Thales SAL

11   has not paid Wamar the KIP Royalty, and Mr. Daix has informed Wamar senior management that

12   it never will because he believes Thales has successfully hidden the evidence of their agreements

13   and the calculation of what is owed. Despite this mistaken belief, Wamar has documentary

14   evidence of Thales' obligation to pay the 6.4% KIP Royalty calculation.

15        **D. Kuwait Airways Consultancy Services Agreement**

16        135.    Recognizing Wamar senior management's successful history and extensive

17   contacts in the Middle East, Thales approached Wamar in 2013 to assist with another airline

18   company it could not achieve business with, Kuwait Airways. On February 5, 2014, Wamar and

19   Thales Avionics entered into an agreement (hereinafter referred to as the "Kuwait 2014 LOI")

20   pursuant to which Thales Avionics agreed to select Wamar as a subcontractor on the "Kuwait

21   Project," subject to two conditions: (1) that Thales is selected as sole supplier of IFE system

22   products and support services for Kuwait Airways' fleet of (7) Airbus 320 ("A320") and (9)

23   Airbus 330 ("A330") aircraft; and (2) Thales Avionics and Wamar reach a mutual written

24   agreement on the terms and conditions of the subcontract. Wamar's efforts secured a contract for

25   the installation of IFE systems of (5) A330 with (4) "optional" aircraft. As compensation, Thales

26   Avionics agreed to pay Wamar a KIP Royalty fee of 5% of the total contract value. The contract

27   value to Thales Avionics is approximately $18.5M, thus Wamar's fee is $0.925M.

28        136.    On March 28, 2014, in line with the global January 2013 LOI, Wamar and Thales

193117

Avionics entered into a Distributorship Agreement wherein Thales Avionics appointed Wamar, on a case-by-case basis, as the sole distributor of Thales Avionics' products and services in support of the IFE systems installed on customers' aircraft in Kuwait.  As contracts were awarded to Thales Avionics by airlines, Wamar would be appointed as the sole distributor for Thales Avionics for such customer via an addendum to the Distributorship Agreement setting forth the terms and conditions of Wamar's distributorship for that customer.

137.    Thales Avionics was aware that other companies, including companies in the aviation business such as Panasonic, Rolls Royce, and Airbus, were the subject of investigations by U.S., British and other governments regarding violations of various anti-bribery and anti-corruption laws.  Thales Avionics and Thales S.A. were concerned that paying a high fee to Wamar might attract the interest of governmental investigators. Accordingly, instead of directly paying Wamar the $0.925M fee it had earned securing the Kuwait Airways contracts, Thales Avionics preferred to disguise the source of its payment obligation (Wamar's activities as a Business Advisor), and required Wamar to enter into an Addendum to the Distributorship Agreement.  Pursuant to the Addendum, Wamar purchased $1.85M of products from Thales Avionics at a fifty percent (50%) discount ($0.925M) for sale to Kuwait Airways at full price, with the idea that Wamar would earn its $0.925M fee from the margin and Thales Avionics would conceal that it was paying a Business Advisor.  Thus, Thales Avionics used a money-laundering scheme to pay Wamar and hide its payments from both its senior management in Paris and from governmental investigators. On repeated occasions, Wamar, its principal and associated companies have advised Thales that there was no need to divert payments through channels other than the intended as Wamar, being in the spare parts business for a long time, has performed all of its business transparently and flawlessly. Nevertheless, Thales decided to carry the payment out its own way to avoid scrutiny of US and other international authorities.

138.    Thales Avionics had the money.  Thales Avionics also had all the power.  Wamar had fully performed its obligations under the Kuwait 2014 LOI and was owed $0.925M.  Thales Avionics refused to simply pay what was owed. Instead, it forced Wamar into a convoluted money-laundering distributorship scheme to mask Thales Avionic's own potential violations of

1 │ law It was not Wamar's idea to have to re-earn its fee by selling parts for Thales Avionics.  Thales

2 │ Avionics ruthlessly took advantage of its power to impose the parts sales scheme on Wamar, and

3 │ even then, Wamar did not get paid.

4 │      139.    Kuwait Airways ordered only half of the products Wamar had to purchase, leaving

5 │ Wamar with a shortfall of approximately $0.4M.  That money was earned by Wamar as a result of

6 │ its actions as a Business Advisor.  While Thales Avionics may prefer to hide the reason it owes

7 │ Wamar the money, it cannot escape its liability by requiring Wamar to purchase more Thales

8 │ Avionics products than the customer needed and furthermore, telling Wamar "tough luck" when

9 │ the customer doesn't order the parts Thales Avionics required Wamar to purchase.

10 │      140.    Following TABA's success with Kuwait Airways, Thales asked Wamar senior

11 │ management to secure another Kuwait project of (10) B777X aircraft. Marc Duflot, President of

12 │ Thales Middle East, promised Wamar senior management that a written agreement was being

13 │ prepared by its legal department. That promise was false.  With Thales SAL's urging and consent,

14 │ Wamar senior management engaged in significant, protracted and difficult negotiations with

15 │ Kuwait Airways and as a result, it was near-certain that Thales Avionics would be awarded the

16 │ contract.

17 │      141.    By then, Wamar senior management finally realized that Thales SAL, in

18 │ conjunction with Thales S.A., was not acting in good faith and grew concerned that Thales SAL

19 │ intended to take advantage of Wamar's efforts and then refused to present it with a written

20 │ agreement memorializing the agreed-upon compensation for Wamar's work. Accordingly, prior to

21 │ the award announcement, Wamar senior management asked Mr. Duflot to provide Wamar with

22 │ the agreement the parties had agreed upon and Mr. Duflot had promised.

23 │      142.    Mr. Duflot shockingly responded that he and Thales SAL had no intention of

24 │ giving Wamar an agreement for this deal because this was now an "easy win" for Thales SAL

25 │ since Wamar had already won the A330 contract previously for Thales. Wamar put Thales SAL

26 │ into position to win this contract but Thales SAL refused to provide a written contract for the

27 │ parties. Thales SAL believed it could receive the (10) B777X contract and avoid paying Wamar by

28 │ refusing to give Wamar a written contract, and accordingly, instructed Wamar senior management

1   to stop work, preventing further performance by Wamar. Without Wamar's continued assistance

2   and promotion, again not surprisingly, Thales SAL lost this deal to its competitor. If not for

3   Thales SAL's and Thales S.A.'s greed and bad faith, Thales Avionics would have been awarded

4   the contract. Thales Avionics cannot use this embarrassing failure caused by its own bad faith act

5   as an excuse not to pay Wamar the fees it earned. Accordingly, Wamar, having fully performed its

6   obligations to Thales SAL, is entitled to the full value of its work.

7        143.   After Thales SAL failed on the Second Kuwait Campaign, Thales executives again

8   asked Wamar senior management for more help. In July 2017, a Third Kuwait Campaign was

9   presented to Wamar senior management via TABA. Kuwait announced the purchase of (15)

10   A320/A321 aircraft and Thales wanted to win this deal. This time, another Thales Group

11   company, Thales AMEWA, contracted with TABA to secure this campaign. Wamar's team

12   worked very hard on this project and incurred related costs in excess of $1M. Thales' competitors

13   fought hard and put up a massive campaign with Kuwait in order to win this contract. Once again,

14   because of Wamar senior management's work and relationships built over decades, Thales

15   AMEWA was in the lead to win this contract.

16        144.   Thales AMEWA was well aware of Wamar senior management's success and

17   equally aware that it was positioned to win the contract. Consistent with the Thales Group's

18   pattern of evading its obligations to pay Wamar and TABA the fees they earned, near the end of

19   the Third Kuwait Campaign, Thales executives instructed Wamar senior management to stop

20   working on the campaign because they had found a *real influential senior businessman in*

21   *Kuwait*" who would absolutely deliver the deal to Thales AMEWA. Wamar senior management

22   protested against the last minute diversion but, as instructed, suspended Wamar's activities on the

23   Third Kuwait Campaign. Once again, Thales could not secure the contract without Wamar's

24   assistance, and a competitor won the award instead.

25        145.   As before, but for Thales AMEWA's bad faith last-minute instruction to Wamar

26   senior management to suspend work, Thales AMEWA would have won the contract. And as

27   before, in contrast to Thales AMEWA, TABA acted in good faith and fully executed its

28   obligations in connection with the Third Kuwait Campaign. Accordingly, TABA again earned its

1   $0.5M fee. In addition, with Thales AMEWA's urging and consent, TABA incurred

2   approximately $1M in out-of-pocket costs pursuing the Third Kuwait Campaign and is entitled to

3   reimbursement of those costs, subject to proof.

4           ***E.   Turkish Airlines Consultancy Services Agreement***

5         146.     Consistent with its track record of failure in the Middle East, Thales was also

6   unsuccessful in obtaining contracts with Turkish Airlines because Turkish Airlines has purchased

7   its IFE systems from Panasonic and other suppliers for over 40 years. Thales wanted

8   Wamar/TABA to assist it in its efforts to obtain contracts from Turkish Airlines as well. Thales

9   contacted Wamar to lead the negotiations with Turkish Airlines and agreed to compensate Wamar

10   a 5% fee on the total value of the contract, if awarded. Thales was so pessimistic that when

11   Wamar executives asked Thales executives what chance they thought they had of getting a deal

12   with Turkish Airlines; the response from Thales was "zero."

13         147.     The first Turkish Airlines campaign began in 2014. On June 24, 2014, TABA and

14   Thint WECO entered in a Consultancy Services Agreement wherein TABA contracted with Thint

15   WECO as a Business Advisor to negotiate with Turkish Airlines to award a commercial contract

16   to Thint WECO to install IFE systems on its fleet of aircraft (hereinafter referred to as "The First

17   Turkish Campaign").

18         148.     In this contract, a fee structure set forth in Appendix 2 provides for a consultancy

19   fee of €150,000 ($0.17M) for consulting services, as well as a bonus fee for each project.

20         149.     Against all odds, Wamar successfully obtained an award for forty-five (45) A321

21   and B737 aircraft at a price of approximately $61M, thus securing for Thales its first-ever contract

22   with Turkish Airlines. Wamar's compensation is approximately $2.8M, subject to proof.

23         150.     Again, instead of paying Wamar its earned fee of the total contract, Thint WECO

24   chose to conceal the payment to Wamar as a business advisor, and instead required Wamar to

25   recoup its fee using Thales Group's spare parts sales scheme. Thint WECO instructed Wamar to

26   invoice Turkish Airlines for a total of $6M for spare parts when and as delivered. Wamar's

27   accumulated margin for the total invoicing would equate to the $2.8M fee it had earned. However,

28   Turkish Airlines abruptly stopped ordering these parts leaving Wamar short on fees owed. On

193117

1  information and belief, Thales has been selling parts directly to Turkish Airlines, circumventing

2  and violating its obligations to Wamar. On July 24, 2018, a courtesy copy of this complaint was

3  sent to Thales, with an invitation to engage in discussions with Wamar.  Shortly thereafter,

4  unexpectedly, Turkish airlines requested and placed an order with Wamar for additional spare

5  parts of approximately $0.7M. When Wamar passed the order to Thales in Irvine, CA, the answer

6  was that the discount is no longer applicable and that prices have increased more than 20%, thus

7  cheating Wamar once again out of the profit margin it was to receive by winning the contract.

8       151.    Thales also agreed with Wamar that Wamar would earn a fee equal to 5% of the

9  total deal, or approximately $3M.  One of conditions which was required by Turkish Airlines and

10  actively encouraged and verbally agreed to by Thales was for Wamar to establish an off-set

11  program by creating a company in Turkey to create jobs and add value to the local economy. That

12  concept was supported by Thales, and Thales told Wamar to "do whatever it takes" to win Turkish

13  Airlines as a client. TABA and Wamar fully performed all of their obligations under the First

14  Turkish campaign and are entitled to its earned fees.

15       152.    In addition to successfully securing the contract between Turkish Airlines and

16  Thint WECO, Wamar was able to secure another contract between Thint WECO and Turkish

17  Airlines in 2016.

18       153.    On September 1, 2016, TABA and Thint WECO entered into a Consultancy

19  Services Agreement to supply IFE systems to (167) aircraft for Turkish Airlines (hereinafter

20  referred to as "the Second Turkish campaign").  In order to avoid governmental scrutiny, Thint

21  WECO insisted that the contract be solely with TABA, rather than have any written agreement

22  with Wamar.  Nevertheless, upon Thint WECO's instructions, Wamar continued to set up the off-

23  set program.  Wamar opened up the off-set program facility in Mercin, Turkey and hired

24  employees to satisfy this requirement to win the Turkish airlines business in general and this

25  contract in particular.  Even though Thales encouraged Wamar to open the facility at a cost of

26  about $2.5M to Wamar, Thales created problems and drove up the cost getting it established.

27       154.    In or around September/October of 2016, Wamar was advised by Turkish Airlines

28  executives that the Turkish contract would be awarded to Thint WECO. To finalize the deal,

193117

1  Turkish Airlines asked Thint WECO to travel to Turkey and sign the contract with Turkish

2  Airlines.  Thint WECO, however, let weeks go by before responding to the request.  During that

3  time, the CEO of Turkish Airlines retired, and with a new CEO in place and no response from

4  Thint WECO, Turkish Airlines instead awarded the contract to a competitor.

5       155.    TABA and Wamar fully performed all of their obligations under the Second

6  Turkish campaign as required by Thint WECO, and secured the contract for Thint WECO.  But for

7  Thint WECO's inexcusably negligent failure to sign the contract with Turkish Airlines when

8  requested, this deal would have closed.  Accordingly, TABA earned its fees under the Second

9  Turkish campaign.  In addition, Wamar is entitled to reimbursement for the costs of establishing

10  the Mercin, Turkey facility, as well as the costs it will incur in closing this now unnecessary

11  facility.  The sum of the commercial contracts for the Turkish Airlines fleet was estimated to be

12  $235M for the installation of IFE systems. TABA is contractually entitled to approximately $12M,

13  subject to proof. The "offset program" facility Wamar set up in Mercin, Turkey which now needs

14  to be closed down along with the termination of 18 Turkish employees (additional victims of Thint

15  WECO's failure to perform).  Wamar continues to pay rent and closing of the off-set program will

16  not take place prior to the end of 2019.  The costs incurred to set up the facility are approximately

17  $2.5M and the costs to shut down this facility are approximately $0.7M-$0.9M.  Had Thint

18  WECO simply signed the contract when instructed, the deal would have been closed and the offset

19  facility would be operating.  Wamar is entitled to reimbursement for the costs it incurred in

20  establishing and closing the offset facility.  In addition, Wamar was asked on different occasions

21  to provide consulting services and market intelligence on different Turkish industries. For

22  example, on July 11, 2016, Thales requested Wamar senior management to arrange a meeting with

23  the Turkish top military and airline decision makers to be held on July 19th in Ankara and

24  Istanbul. Wamar worked extremely hard with very short notice and arranged the meetings as

25  requested. On July 13th, Thales executives abruptly informed Wamar to cancel the meetings as

26  they had been advised not to travel to Turkey for security reasons. The Thales executives would

27  not divulge the security issue that caused them to cancel the meetings.

28

193117

COMPLAINT

***Thales Implemented a Coordinated Plan to Exploit Wamar and TABA***

156.    Thales has several operating companies that contract with Wamar, TABA and their senior managements. These operating companies approach Wamar or TABA, desperately seeking help in getting valuable new contracts, or to fix a problem they created.  Wamar and/or TABA proceeds to engage with the Thales operating company(s), and they agree on a compensation plan that is pursuant to Wamar's or TABA's success.  TABA and/or Wamar expend efforts, at their own expense, for months and in many cases years, to get the contracts for Thales Avionics.  Once Thales has the contract in hand, or believe they are positioned so well they can't lose it, they fabricate an excuse to terminate Wamar and/or TABA, without paying the agreed-upon compensation. Using this scheme against Wamar and TABA, combined, Thales owes Wamar/TABA and their principals over $400M for fees that have been earned in delivering multiple contracts to Thales.

157.    Although the damages numbers are not included in any cause of action, the portion in this Complaint regarding The Etihad Railroad Project is indicative of how Thales operates. It is known that Thales operating companies have been unsuccessful in obtaining IFE business in major areas in the Middle East region. In order to obtain these lucrative contracts, Thales entices TABA and/or Wamar to engage with them.  Thales tried to get Phase 1 of the rail project, but failed. Accordingly, it engaged Wamar to get them the Phase 2 contract.  Thales agreed to pay a fee to Wamar upon award of the contract. Wamar successfully shortlisted Thales as a number one lead bidder. Then, without any cause, Thales told Wamar to forego its fee, or Thales would terminate both Wamar and TABA on other projects with Thales companies.  Wamar had no choice but to submit to the extortion, and walk away from over $30M in fees it had earned.  Wamar will seek those fees in a separate action.

158.    The Section of this Complaint on TABA's Airline Consultancy Agreements is also consistent with Thales' exploitation plan against TABA and Wamar.  This Section describes five (5) different agreements, all of which have Thales operating companies benefiting from Wamar and TABA's efforts, and then refusing to pay fees that Wamar and TABA had earned.  Although the damage numbers from this Section are not included in any Causes of Action in this complaint,

1   Thales' actions under the consultancy agreements demonstrate its venality. TABA will be seeking

2   those fees in a separate action.  Each Agreement is briefly summarized below:

3         ***a.***     ***Qatar Airways A320 Consultancy Services Agreement***

4        159.    TABA successfully secured (9) IFE systems ship sets for installation on aircraft,

5   even though these aircraft were sold to other airlines, the fact that TABA succeeded in providing

6   Thales IFE systems on these aircraft, it should be compensated pro-rata for these aircraft.  Thales

7   has never paid TABA and has not even attempted to provide a reason why not.  TABA will be

8   seeking those fees in a separate action.

9         ***b.***     ***Qatar Airways A350 Consultancy Services Agreement***

10        160.    Thales operating companies had a lucrative contract with Qatar Airways, but not

11   long after the delivery of (17) aircraft, Qatar Airways cancelled the remaining (63) aircraft due to

12   Thales' inept performance. Wamar and TABA was successfully able to reinstate the remaining

13   (63) aircraft contract.  Thales had agreed to pay TABA and Wamar $16M, of which $10M outright

14   to TABA and $6M to Wamar's KIP Royalty.  Instead of paying the mutually agreed fees that it

15   owed, Thales operating companies manipulated the contracts to avoid paying Wamar and TABA,

16   then forced settlement agreement into place for only €4M ($4.6M), under threat of terminating

17   other TABA and Wamar contracts with Thales. TABA will be seeking those fees in a separate

18   action.

19         ***c.***     ***Emirates Consultancy Agreement***

20        161.    Thales operating companies were unable to secure a contract with Emirates, and so

21   they approached Wamar.  Wamar, through four (4) campaigns on separate projects, has (1)

22   successfully secured contracts for Thales valued at approximately $975M for installation of IFE

23   systems on (150) B777X aircraft, (2) has been assured that Emirates will award Thales a contract

24   valued at approximately $400M for installation of IFE systems on (65) A380 aircraft, and (3)

25   continues to represent Thales in an effort to obtain a contract for (40) B787 aircraft.  Thales

26   operating companies agreed to pay Wamar $70M plus for the B777X contracts, $25.6M plus for

27   the A380 aircraft, and $12.8M plus for the B787 aircraft.  To date, Thales owes Wamar, at the

28   very least $240.75M, but has paid a scant $0.21M and denies its obligation to pay the 6.4% KIP

1   Royalty Wamar had earned. These fees are all subject to the Causes of Action in this Complaint.

2         ***d.***     ***Kuwait Airways Consultancy Services Agreement***

3        162.    Thales sought out Wamar, its principal and associated companies for assistance

4   with getting contracts with Kuwait Airways. Wamar first successfully got a contract for five (5)

5   aircraft. Wamar's fee was to be $0.925M. To avoid paying, Thales forced TABA to enter into a

6   distributorship agreement scheme pursuant to which Wamar would buy parts from Thales at a

7   50% discount and sell them at full price to the customer until its fee was paid. But Kuwait

8   Airways has stopped buying parts from Wamar and thus, only half of the fee has been paid.

9   Thales twice more sought out Wamar and TABA for help with Kuwait Airways, first to pursue

10   (10) B777X aircraft, and then to pursue A320 aircrafts. With the (10) B777X, once Thales

11   believed Wamar and TABA had it in position to win the contract, they told Wamar/TABA to stop

12   working (that way Thales planned to get the contract on their own, but to avoid paying).

13   Wamar/TABA stopped as requested, and Thales blew the deal, losing to its competitor. Not

14   learning from its previous (10) B777X mistake, Thales repeated it with the A320/A350 aircraft

15   deal. Once again, TABA had Thales positioned to win the contract, in turn, Thales told

16   Wamar/TABA senior management to stop working, because they located another local business

17   advisor, who could deliver the winning contract, and that the new advisor was to share the fees

18   with TABA. Again, Thales blew the deal. In both cases, Wamar and TABA had put Thales in a

19   position to win the contracts, and in both cases, Thales tried to cheat Wamar/TABA out of its fees.

20   Thales lost the contracts due to greed and incompetence; however, Wamar/TABA had already

21   incurred marketing expenses that exceeded $0.5M. Thales owes Wamar/TABA its KIP Royalty in

22   addition to the amounts already expended over the campaigns. TABA will be seeking those fees in

23   a separate action.

24         ***e.***     ***Turkish Airlines Consultancy Services Agreement***

25        163.    Thales could not win a contract with Turkish Airlines, and wanted to engage

26   Wamar. Wamar successfully secured a large IFE systems contract (approximately $61M) for

27   Thales, and Thales agreed to pay Wamar $2.8M. Again, instead of paying Wamar, Thales

28   concocted a plan whereby Wamar was to get its money through a spare parts scheme. Wamar

1  remains entirely unpaid.  Further, TABA secured a second much larger contract for Thales, valued

2  at $235M but Thales failed to respond in due time, finalize the contract and fulfill its promises to

3  work with Wamar in establishing the off-set program.  Moreover, part-way through the process,

4  Thales insisted that the agreement be transferred to TABA (a non-U.S. company), and when the

5  contract was won, refused to act expediently to sign the approved contract due to summer holidays

6  in France.  Thus, Wamar/TABA was left with a huge loss after over 3 years of marketing, sales and

7  extensive travel in addition to the losses incurred from the off-set program that Wamar has

8  established for spare parts distribution for Thales and other related issues.  Thales had agreed to

9  pay TABA $12M, but consistent with its exploitation plan, refuses to compensate TABA/Wamar

10  for their losses. TABA will be seeking those fees in a separate action.

11  ## IV. CAUSES OF ACTION

12  ### FIRST CAUSE OF ACTION

13  **(Breach of Contract against Thales Avionics Regarding the January 2013 LOI)**

14  164.   Plaintiff incorporates the allegations set forth in paragraphs 1 through 163.

15  165.   Plaintiff Wamar and Defendant Thales Avionics entered into the January 2013

16  Letter of Intent, regarding the Emirates Airlines project, which is binding upon the parties.

17  Wamar has performed all of its obligations under the contract, and the conditions precedent,

18  except those which are excused as a result of Defendant's breach.

19  166.   The January 2013 LOI was subject to only two conditions subsequent: 1) that

20  Emirates select Thales Avionics as sole supplier for IFE system products, support services, and

21  connectivity for certain aircraft; and 2) that Wamar and Thales Avionics reach mutual written

22  agreement on subcontracting terms and conditions, in accordance with the principles set out in the

23  Emirates 2012 MOU.

24  167.   As a result of work done by Wamar, in September 2016, Emirates awarded Thales

25  Avionics a $975M contract for the installation of IFE systems on (150) B777X aircraft, in addition

26  to technology services ordered by Thales, thus satisfying the first condition of the January 2013

27  LOI.

28  168.   Defendant Thales Avionics and Wamar reached mutual written agreement when

193117

41

they finalized the language of the SLA.  Accordingly, the second condition of the January 2013 LOI was also satisfied.

169.   Under the January 2013 LOI, Wamar was to perform by: (a) securing contracts with Emirates for the installation and maintenance of IFE systems on certain B777X and/or A380 aircraft; and (b) securing a contract for Thales Avionics to establish and operate The Dubai Centers.  Thales Avionics agreed to subcontract the operation of The Dubai Centers to Plaintiff in accordance with the terms of the SLA and to pay Wamar a $5.75M non-recurring fee in connection therewith.

170.   As a direct result of Wamar's efforts, Thales Avionics has been awarded Emirates contracts for the installation and maintenance of IFE systems and technology services for (150) B777X aircraft. These contracts are valued at approximately $975M plus. Thales Avionics and Wamar agreed that Plaintiff would be compensated in an amount equal to 6.4% of the total value of the awarded contracts plus the technology services, or approximately $70M plus, subject to proof.

171.   In addition, as instructed by Thales, Plaintiff Wamar, for the benefit of Thales Avionics, secured the right to establish and operate The Dubai Centers.  The original term of the SLA is 10 years, plus a 2-year option, however Plaintiff and Defendant discussed that Defendant might purchase the facility in 5-6 years at a mutually agreeable price, but no less than what Plaintiff would have earned during the 26 -year term of the SLA for its management fee.

172.   Notwithstanding that the final terms of the SLA were agreed-upon, and that Wamar secured the space to operate The Dubai Centers, Thales Avionics has unilaterally decided not to subcontract operation of The Dubai Centers to Wamar, or to pay Wamar any management fee in total and complete breach of its contractual obligations, representations and promises to Wamar and its senior management.

173.   Plaintiff Wamar spent approximately $15M plus over seven years in out-of-pocket costs to perform under the January 2013 LOI and to establish the space to operate The Dubai Centers for Thales Avionics.

174.   For having delivered contracts to Thales Avionics for (150) B777X aircraft for

1 | installation of IFE systems Wamar reasonably expected to earn at minimum $150M over the 26-
2 | year term of The Dubai Centers, promised by Thales.

3 |      175.   Under the January 2013 LOI, Thales Avionics owes Wamar not less than
4 | $240.75M as follows:

5 |      a.    $5.75M non-recurring fee;

6 |      b.    $70M with respect to securing the IFE system contracts;

7 |      c.     $15M in out-of-pocket fees; and

8 |      d.    $150M for operating The Dubai Centers.

9 |      176.   Defendant Thales Avionics has paid only a single payment of $0.21M to Wamar
10 | against the $240.75M it owes.

11 |      177.   As a result of Defendant Thales Avionics' breach of contract, Wamar has been
12 | damaged in an amount of not less than $240M, the exact amount of which will be proven at trial.

13 | **SECOND CAUSE OF ACTION**

14 | **(Intentional Misrepresentation Against Thales Avionics and Budin**

15 | **Regarding the January 2013 LOI)**

16 |      178.   Plaintiff incorporates the allegations set forth in paragraphs 1 through 177.

17 |      179.   Plaintiff Wamar and Defendant Thales Avionics entered into the January 2013
18 | Letter of Intent, regarding the Emirates Airlines project, which is binding upon the parties.

19 |      180.   The January 2013 LOI was subject to only two conditions subsequent: 1) that
20 | Emirates select Thales Avionics as sole supplier for IFE systems products, support services, and
21 | connectivity technology for certain aircraft; and 2) that Wamar and Thales Avionics reach mutual
22 | written agreement on subcontracting terms and conditions, in accordance with the principles set
23 | out in the Emirates 2012 MOU.

24 |      181.   Defendant Thales Avionics intentionally made false representations (hereinafter
25 | collectively referred to as the "False Representations") to Plaintiff Wamar as set forth below:

26 |      a.    Defendant Thales Avionics represented that it would execute the SLA and perform
27 |           its obligations thereunder, as set forth in the January 2013 LOI;

28 |      b.    Defendants Thales Avionics and Budin made representations to Wamar that Thales

Avionics intended to pay Wamar KIP Royalty fees equal to 6.4% of the total value of contracts that Wamar secured from Emirates for Thales Avionics for the installation of IFE systems and technology services on Emirates aircraft;

c.     Defendants Thales Avionics and Budin made further representations to Wamar that Wamar would be approved as a KIP as set forth in the final draft of the SLA in order to induce Wamar to continue to perform and expend millions of dollars to benefit Thales Avionics and Thales S.A.;

d.     Defendant Thales Avionics and Budin made further representations to Wamar that Thales Avionics would subcontract to Wamar the operation of The Dubai Centers.

182.   Defendants Thales Avionics and Budin made the False Representations to Wamar intentionally and without regard for their truth and did not intend to perform as represented.

183.   Defendants Thales Avionics and Budin intended that Wamar rely on the False Representations in order to secure valuable contracts from Emirates regarding its IFE system proposals.

184.   Using the False Representations, Defendants Thales Avionics and Budin induced Wamar to continue to perform its obligations under the January 2013 LOI and the SLA, while at the same time having no intention of paying Wamar for its efforts.

185.   Plaintiff Wamar reasonably relied on Thales Avionics' and Budin's False Representations in believing it would be paid for delivering valuable IFE system contracts from Emirates to Thales Avionics.

186.   Due to Defendants Thales Avionics' and Budin's False Representations, Plaintiff Wamar was in fact harmed and continues to be harmed.

187.   Plaintiff Wamar's reliance on Thales Avionics' and Budin's False Representations was a substantial factor in causing Wamar's harm.

188.   As a direct result of Defendants Thales Avionics' and Budin's False Representations, Thales Avionics and Budin induced Wamar to spend years of effort and millions of dollars acting for the benefit of Thales Avionics. In that regard, in reliance upon the False Representations, Plaintiff Wamar secured over $2B worth of valuable contracts (for already won

1   contracts and additional contracts being negotiated) with Emirates for the Defendant Thales

2   Avionics.

3       189.   Due to Defendant Thales Avionics' and Budin's False Representations, Thales

4   Avionics owes Plaintiff Wamar not less than $240.75M as follows:

5       a.     $5.75M non-recurring fee;

6       b.     $70M with respect to securing the IFE systems contracts;

7       c.     $15M in out-of-pocket fees; and

8       d.     $150M for operating The Dubai Centers.

9       190.   Defendant Thales Avionics has paid only a single payment of $0.21M to Wamar

10   against the $240.75M it owes.

11       191.   As a result of Defendants Thales Avionics' and Budin's intentional

12   misrepresentations, Wamar has been damaged in an amount of not less than $240M, the exact

13   amount of which will be proven at trial.

14       192.   The False Representations were willfully made by Defendants Thales Avionics and

15   Budin to induce Plaintiff Wamar's continued efforts to secure contracts for the benefit of Thales

16   Avionics.

17       193.   The False Representations were willfully made by Defendants Thales Avionics and

18   Budin in order to avoid scrutiny by government authorities regarding its use of Business Advisors,

19   and to be able to deny that Thales Avionics had ever made KIP Royalty commitments to Plaintiff

20   Wamar.

21       194.   The False Representations of Defendants Thales Avionics and Budin were

22   malicious and highly prejudicial to the financial health of Wamar.  Thales Avionics and Budin

23   induced Wamar to act while Thales Avionics received substantial revenues and profits due to

24   Wamar's efforts, but yet paid Wamar less than 0.1% of what it is owed.

25       195.   By cause of the fraudulent, willful and malicious conduct of Defendants Thales

26   Avionics and Budin, Plaintiff Wamar is entitled to exemplary and punitive damages against

27   Thales Avionics in an amount to be determined at trial but believed to be in excess of $720M.

28

***THIRD CAUSE OF ACTION***

**(Negligent Misrepresentation Against Thales Avionics and Budin Regarding the January**

**2013 LOI)**

196.  Plaintiff incorporates the allegations set forth in paragraphs 1 through 195.

197.  Plaintiff Wamar and Defendant Thales Avionics entered into the January 2013 Letter of Intent, regarding the Emirates Airlines project, which is binding upon the parties.

198.  The January 2013 LOI was subject to only two conditions subsequent: 1) that Emirates select Thales Avionics as sole supplier for IFE system products, support services, and connectivity technology for certain aircraft; and 2) that Wamar and Thales Avionics reach mutual written agreement on subcontracting terms and conditions, in accordance with the principles set out in the Emirates 2012 MOU.

199.  Defendants Thales Avionics and Budin negligently made false representations (hereinafter collectively referred to as the "False Representations") to Wamar as set forth below:

a.  Defendants Thales Avionics and Budin represented that Thales Avionics would execute the SLA and perform its obligations thereunder, as set forth in the January 2013 LOI;

b.  Defendant Thales Avionics and Budin made representations to Wamar that Thales Avionics intended to pay Wamar KIP Royalty fees equal to 6.4% of the total value of contracts that Wamar secured for the installation of IFE systems and technology services on Emirates aircraft;

c.  Defendant Thales Avionics and Budin made further representations to Wamar that Wamar would be approved as a KIP as set forth in the final draft of the SLA;

d.  Defendant Thales Avionics and Budin made further representations to Wamar that it would subcontract to Wamar the operation of The Dubai Centers.

200.  Although Defendants Thales Avionics and Budin may have honestly believed that some or all of the False Representations were true, Thales Avionics and Budin had no reasonable grounds for believing the False Representations were true when they were made.

201.  Defendants Thales Avionics and Budin intended that Wamar rely on the False

1  Representations in order to secure valuable contracts from Emirates regarding its IFE systems
2  aircraft proposals.

3      202.    Using its False Representations, Defendants Thales Avionics and Budin induced
4  Wamar to continue to perform its obligations under the January 2013 LOI with no reasonable
5  expectation that Thales Avionics would pay Wamar.

6      203.    Plaintiff Wamar reasonably relied on Thales Avionics' and Budin's False
7  Representations in believing Wamar would be paid for delivering valuable Emirates IFE systems
8  contracts to Thales Avionics.

9      204.    Due to Defendants Thales Avionics' and Budin's False Representations, Plaintiff
10  Wamar was in fact harmed and continues to be harmed.

11      205.    Plaintiff Wamar's reliance on Thales Avionics' and Budin's False Representations
12  was a substantial factor in causing Wamar's harm.

13      206.    As a direct result of Defendants Thales Avionics' and Budin 's False
14  Representations, Thales Avionics and Budin induced Plaintiff Wamar to spend years of effort and
15  millions of dollars acting for the benefit of Thales Avionics.  In that regard, in reliance upon the
16  False Representations, Plaintiff Wamar secured over $2B worth of valuable contracts (for already
17  won contracts and additional contracts being negotiated) with Emirates for the Defendant Thales
18  Avionics.

19      207.    Due to Defendants Thales Avionics' and Budin's False Representations, Thales
20  Avionics owes Plaintiff Wamar not less than $240.75M as follows:

21      a.    $5.75M non-recurring fee;

22      b.    $70M with respect to securing the IFE systems contracts;

23      c.    $15M in out-of-pocket fees; and

24      d.    $150M for operating The Dubai Centers.

25      208.    Defendant Thales Avionics has paid only a single payment of $0.21M to Wamar
26  against the $240.75M it owes.

27      209.    As a result of Defendant Thales Avionics' and Budin's misrepresentations, Wamar
28  has been damaged in an amount of not less than $240M, the exact amount of which will be proven

193117

47

1   at trial.

2          210.   The False Representations were negligently made by Defendants Thales Avionics

3   and Budin to induce Wamar's continued efforts to secure contracts for the benefit of Thales

4   Avionics.

5          211.   The False Representations were negligently made by Defendants Thales Avionics

6   and Budin in order to avoid scrutiny by government authorities regarding Thales Avionic's use of

7   Business Advisors, and to be able to deny that Thales Avionics had ever made KIP Royalty

8   commitments to Wamar.

9          212.   Defendants Thales Avionics and Budin induced Wamar to act while Thales

10  Avionics received substantial revenues and profits due to Wamar's efforts, but Thales Avionics

11  has paid Wamar less than 0.1% of what it is owed.

12         213.   As a direct result of the fraudulent and negligent conduct of Defendants Thales

13  Avionics and Budin, Plaintiff Wamar is entitled to exemplary and punitive damages against

14  Thales Avionics in an amount to be determined at trial but believed to be in excess of $720M.

15                          ***FOURTH CAUSE OF ACTION***

16              **(Intentional Misrepresentation Against Thales S.A. and Budin)**

17         214.   Plaintiff incorporates the allegations set forth in paragraphs 1 through 213.

18         215.   Plaintiff Wamar and Defendant Thales Avionics entered into the Emirates 2012

19  MOU and January 2013 LOI, regarding the Emirates Airlines project (collectively, "The Emirates

20  Agreements"), which are binding upon the parties.

21         216.   The January 2013 LOI was subject to only two conditions subsequent: 1) that

22  Emirates select Thales Avionics as sole supplier for IFE system products, support services, and

23  connectivity for certain aircraft; and 2) that Wamar and Thales Avionics reach mutual written

24  agreement on subcontracting terms and conditions, in accordance with the principles set out in the

25  Emirates 2012 MOU.

26         217.   Pursuant to the Emirates Agreements, Plaintiff Wamar and Defendant Thales

27  Avionics agreed to enter into the SLA upon agreement of the terms thereof, consistent with the

28  principles of the Emirates 2012 MOU.

193117

1    218.    Defendant Thales S.A. was aware of the Emirates Agreements and the obligation of

2    Thales Avionics to execute the SLA.

3    219.    Defendants Thales S.A. and Budin intentionally made false representations

4    (collectively the "False Representations") to Plaintiff Wamar as set forth below:

5        a.    Defendants Thales S.A. and Budin represented to Wamar that Thales Avionics

6              would execute the SLA and perform its obligations thereunder, as set forth in the

7              January 2013 LOI;

8        b.    Thales S.A. and Budin made representations to Wamar that Thales Avionics

9              intended to pay Wamar KIP Royalty fees equal to 6.4% of the total value of

10             contracts that Wamar secured from Emirates for Thales Avionics for the

11             installation of IFE systems and technology services on Emirates aircraft;

12       c.    Defendants Thales S.A. and Budin made further representations to Wamar that

13             Wamar would be approved as a KIP as set forth in the final draft of the SLA in

14             order to induce Wamar to continue to perform and expend millions of dollars to

15             benefit Thales Avionics and Thales S.A.

16       d.    Defendants Thales S.A. and Budin made further representations to Wamar that

17             Thales Avionics would subcontract to Wamar the operation of The Dubai Centers.

18   220.    In support of Defendant Thales S.A.'s and Budin's False Representations, Wamar

19   has documentary evidence confirming that Thales S.A. and Budin understood that Thales

20   Avionics would expect to pay Wamar approximately $150M plus for Wamar operating The Dubai

21   Centers during the 26-year term of the SLA, thus inducing Wamar to continue working.

22   221.    In support of Defendants Thales S.A.'s and Budin's False Representations, Wamar

23   has documentary evidence confirming that Thales Avionics would compensate Wamar in an

24   amount equal to 6.4% of the total value of contracts awarded to Emirates for IFE systems and

25   technology services, in addition to normal profit to be earned from operating both repair The

26   Dubai Centers.

27   222.    Contrary to the False Representations, Defendants Thales S.A. and Budin did not

28   intend to qualify Wamar as a KIP, but instead actively worked against Wamar being qualified as a

193117

49

COMPLAINT

KIP.

223.    Contrary to the False Representations, Defendants Thales S.A. and Budin conspired with Thales Avionics to refuse to sign the SLA.

224.    Contrary to the False Representations, Defendants Thales S.A. and Budin conspired with Thales Avionics to refuse to subcontract operation of The Dubai Centers to Wamar, actively working to deny qualifying Wamar as a KIP so Thales Avionics would not have to award the subcontract to Wamar.

225.    For years, Defendants Thales S.A. and Budin actively induced Wamar to negotiate and secure a position for a long-term lease, as well as establish an office space, and hire staff for The Dubai Centers.  However, when it came time to pay Wamar for all its efforts, Thales S.A. denied Wamar KIP approval, and Thales Avionics used that denial as a fabricated excuse to avoid paying Wamar.  In this way, Thales S.A. could reap the benefit of years of Wamar's efforts and expenditures for free.

226.    Defendants Thales S.A. and Budin made the False Representations intentionally and without regard for their truth, and did not intend to perform as represented.

227.    Defendants Thales S.A. and Budin intended that Wamar rely on the False Representations in order that Thales Avionics could secure valuable contracts from Emirates regarding its IFE system proposals.

228.    Using the False Representations, Defendants Thales S.A. and Budin induced Wamar to continue to perform its obligations to Thales Avionics under the January 2013 LOI and the SLA, while at the same time having no intention of paying Wamar for its efforts, or having Thales Avionics to pay for those efforts.

229.    Plaintiff Wamar reasonably relied on Thales S.A.'s and Budin's False Representations in believing Thales Avionics would pay Wamar for delivering valuable IFE systems contracts from Emirates to Thales Avionics.

230.    Due to Defendant Thales S.A.'s and Budin 's False Representations, Wamar was in fact harmed and continues to be harmed.

231.    Plaintiff Wamar's reliance on Thales S.A.'s and Budin's False Representations was

1  a substantial factor in causing Wamar's harm.

2       232.    As a direct result of Defendant Thales S.A.'s and Budin's False Representations,

3  Thales S.A. and Budin induced Wamar to spend years of effort and millions of dollars acting for

4  the benefit of Thales Avionics.  In that regard, as a result of the False Representations, Wamar

5  secured approximately $2B worth of valuable contracts (for already won contracts and additional

6  contracts being negotiated) with Emirates for Defendant Thales Avionics.

7       233.    Due to Defendants Thales S.A.'s and Budin's False Representations, Thales S.A.

8  owes Wamar not less than $240.75M as follows:

9      a.    $5.75M non-recurring fee;

10      b.    $70M with respect to securing the IFE systems contracts;

11      c.    $15M in out-of-pocket fees; and

12      d.    $150M for operating The Dubai Centers.

13       234.    Defendant Thales Avionics has paid only a single payment of $0.21M to Wamar

14  against the $240.75M owed.

15       235.    As a result of Defendant Thales S.A.'s and Budin's intentional misrepresentations,

16  Wamar has been damaged in an amount of not less than $240M, the exact amount of which will be

17  proven at trial.

18       236.    The False Representations were willfully made by Defendants Thales S.A. and

19  Budin to induce Wamar's continued efforts to secure contracts for the benefit of Thales Avionics.

20       237.    The False Representations were willfully made by Defendants Thales S.A. and

21  Budin in order to avoid scrutiny by government authorities regarding Thales' use of Business

22  Advisors, and to be able to deny that Thales S.A. had ever made KIP Royalty commitments to

23  Wamar.

24       238.    The False Representations of Defendants Thales S.A. and Budin were malicious

25  and highly prejudicial to the financial health of Wamar.  Thales S.A. and Budin induced Wamar to

26  act while Thales S.A. received substantial revenues and profits due to Wamar's efforts, but yet

27  Thales Avionics paid Wamar less than 0.1% of what it is owed.

28       239.    By cause of the fraudulent, willful and malicious conduct of Defendants Thales

193117

1 | S.A. and Budin, Plaintiff Wamar is entitled to exemplary and punitive damages against Thales

2 | S.A. in an amount to be determined at trial but believed to be in excess of $720M.

3 | ### *FIFTH CAUSE OF ACTION*

4 | **(Breach of Implied Covenant of Good Faith and Fair Dealing by Thales Avionics**

5 | **Regarding the January 2013 LOI)**

6 |   240.   Plaintiff Wamar incorporates the allegations set forth in paragraphs 1 through 239.

7 |   241.   Plaintiff Wamar and Defendant Thales Avionics entered into the January 2013

8 | Letter of Intent, regarding the Emirates Airlines project, which is binding upon the parties.

9 |   242.   The January 2013 LOI was subject to only two conditions subsequent: 1) that

10 | Emirates select Thales Avionics as sole supplier for IFE system products, support services, and

11 | connectivity for certain aircraft; and 2) that Wamar and Thales Avionics reach mutual written

12 | agreement on subcontracting terms and conditions, in accordance with the principles set out in the

13 | Emirates 2012 MOU.

14 |   243.   Under the January 2013 LOI, Thales Avionics had an obligation to work with

15 | Wamar in good faith. Thales Avionics knew Wamar was aggressively spending effort and money

16 | pursuing the objectives set out in the Emirates 2012 MOU and the January 2013 LOI.  Thales

17 | Avionics encouraged Wamar to (a) continue pursuing the IFE systems and technology services

18 | contracts with Emirates, (b) continue establishing The Dubai Centers, and (c) secure a space for

19 | The Dubai Centers.  Wamar, in reliance upon Thales Avionics' representations and promises of

20 | performance, did so.

21 |   244.   It is well settled that, in California, the law implies in every contract a covenant of

22 | good faith and fair dealing.  That covenant requires that neither party do anything which will

23 | deprive the other of the benefits of the agreement and not to act in bad faith toward the other

24 | contracting party by misleading the other party or by concealing important information from the

25 | other party.

26 |   245.   In violation of that covenant, Defendant Thales Avionics, with Thales S.A. acting

27 | as the puppet master, engaged in a bad faith scheme to misappropriate Wamar's efforts.  Their

28 | plan was simple and easily repeated:  (1) Induce Wamar to perform; (2) Wait for Wamar to

193117

1  produce a valuable result; (3) Fabricate an excuse to deny paying Wamar or threaten another

2  aspect of Wamar's business; and (4) Reap the benefit of Wamar's efforts free of charge.  Thales

3  Avionics applied this bad faith scheme at least twice in just the January 2013 LOI when (1)

4  Wamar secured a $975M contract for Thales Avionics and (2) when Wamar secured a space for

5  The Dubai Centers.

6     246. In a first example, Defendant Thales Avionics acted in bad faith regarding its

7  refusal to pay Wamar for securing a $975M contract for Thales Avionics.  As described above,

8  Thales Avionics executed its bad faith scheme in four steps:

9    **A.**  *Induce Wamar*

10     247. Defendant Thales Avionics and Plaintiff Wamar agreed that Wamar would earn a

11  KIP Royalty fee equal to 6.4% of the total value of the Emirates IFE systems and technology

12  services contracts but Thales Avionics refused to put the KIP Royalty fee in writing to conceal

13  those payment obligations from governmental scrutiny, and be able to deny that it had ever made

14  that commitment to Wamar.

15    **B.**  *Wait for Wamar to Perform*

16     248. Plaintiff Wamar, induced by the expectation of a 6.4% KIP Royalty fee, worked

17  diligently to secure a $975M plus contract for Thales Avionics for Emirates IFE systems and

18  technology services.

19    **C.**  *Fabricate an Excuse not to Pay.*

20     249. Showing an astonishing level of bad faith, Thales Avionics claimed it did not have

21  any written documentation showing it owed Wamar a 6.4% KIP Royalty fee.  But it was Thales

22  Avionics that agreed to the 6.4% calculation, but refused to put it in writing for regulatory and bad

23  faith purposes.

24    **D.**  *Reap the Benefit of Wamar's Efforts*

25     250. Defendant Thales Avionics refused to pay Wamar the fees it had earned by the

26  awarded contracts to install IFE systems and technology services on Emirates (150) B777X fleet

27  of aircraft.  By doing so, Thales Avionics could reap an additional $70M profit on the deal, all at

28  the expense of Wamar.

251.    In a second example, Thales Avionics acted in bad faith regarding its refusal to pay Wamar for its obtaining the valuable The Dubai Centers.  As described above, Thales Avionics again executed its bad faith scheme in four steps:

**A.**    *Induce Wamar*

252.    The SLA set out the compensation Wamar would earn for operating The Dubai Centers, which, at a minimum, would be the aggregated management fees expected for the 26-year term of the SLA.  If Wamar were to get contracts for (150) aircraft, the compensation to Wamar would be in excess of $150M.

**B.**    *Wait for Wamar to Perform*

253.    It took years of effort, and over $15M dollars in of out-of-pocket expenses, but Plaintiff Wamar successfully established a space for The Dubai Centers, staffed it, and prepared it for operation. Due to its performance under the contract, Wamar expected to begin receiving its management fees.

**C.**    *Fabricate an Excuse not to Pay*

254.    However, Defendant Thales Avionics had a different plan. Instead of paying Wamar, Thales Avionics, under the direction of Thales S.A., began manipulating and changing the requirements for Wamar to be re-qualified as a KIP.  And if Wamar was not a KIP, then Thales Avionics had an excuse not to pay Wamar.  Not surprisingly, Thales S.A. and Thales Avionics disingenuously denied Wamar's KIP re-qualification, and refused to pay Wamar for work it did to establish The Dubai Centers. Further detail as to how Thales schemed to deny KIP re-qualification follows.

**D.**    *Reap the Benefit of Wamar's Efforts*

255.    By refusing to pay Plaintiff Wamar, Defendant Thales Avionics not only has access to a state-of-the art turnkey IFE Repair and the Discovery Dubai Innovation Center, but added at least $150M plus to its bottom line.

**E.**    ***KIP Re-qualification***

256.    Defendant Thales had an obligation to evaluate Wamar fairly and in good faith during the KIP qualification process.  Defendant Thales establishes and controls the qualification

1    criteria for KIP, performs the evaluation, and is the sole and final arbiter of who gets to be a KIP

2    and who does not. Thus, it has complete power over the process. As late as January 9, 2018,

3    Thales Group executives personally told Wamar senior management that Wamar was approved as

4    a KIP and that Wamar should keep performing under the Emirates 2012 MOU, and the January

5    2013 LOI and the SLA. In reliance upon those representations, Wamar did so at considerable

6    expense. Then, without warning, on January 29, 2018, Roger Daix and Budin met with Wamar

7    senior management and informed them that due to Panasonic's issue with the Justice Department

8    in Dubai, Thales would not approve Wamar as a KIP, would not sign the SLA, and as a

9    consequence, Wamar would receive nothing for its efforts even though agreed upon compensation

10   was due.

11        257.   Wamar senior management objected to Thales S.A.'s and Thales Avionics' bad

12   faith. In response, in a letter dated March 9, 2018, Dominique Giannoni, CEO of Thales InFlyt

13   Experience, fell back on the excuse that Wamar failed to re-qualify as a KIP and that the SLA had

14   not been signed. Each of those events, however, was the result of bad faith manipulation of the

15   process by Thales S.A. and Thales Avionics.

16        258.   Mr. Giannoni's assertion that Wamar "does not meet the criteria to perform the

17   project as normally expected from an industrial partner" was made in bad faith because Thales

18   S.A. and Thales Avionics know that Wamar has been a KIP for Thales Group in previous years,

19   that Wamar provided all of the documents requested, and that Wamar was fully qualified to

20   operate The Dubai Centers.

21        259.   Furthermore, Thales S.A.'s and Thales Avionics' denial of Wamar's KIP re-

22   qualification was a blatantly bad faith act designed to pass the entire risk and cost of establishing

23   The Dubai Centers to Wamar with the intent to deny the KIP re-qualification once everything was

24   in place and Thales Avionics could step in and take over the operations without the cost of paying

25   Wamar what it had earned, and what it would earn operating The Dubai Centers during the 26-

26   year term of the SLA.

27        260.   Had Wamar known of Thales S.A.'s and Thales Avionics' bad faith in denying

28   Wamar the KIP re-qualification, Wamar would have taken action to protect itself against such bad

193117

1   faith.  Wamar could have, for example, worked with Thales Group's competitors, or ceased

2   spending money until Thales S.A. and Thales Avionics accepted Wamar as a KIP in writing and

3   executed the SLA.

4        261.    Instead, Plaintiff Wamar acted in reliance upon Thales S.A.'s and Thales Avionics'

5   representations that Wamar would be a KIP and would operate The Dubai Centers as

6   contemplated by the Emirates 2012 MOU and January 2013 LOI and the SLA. As a direct result

7   thereof, Plaintiff has incurred significant damages including out-of-pocket expenses, and lost

8   profits from opportunities passed on while it worked on behalf of Thales Avionics.

9        262.    As a result of Defendant Thales Avionics' bad faith breach of the implied covenant

10  of good faith and fair dealing, Plaintiff Wamar has been damaged in an amount of not less than

11  $240.75M as follows:

12            a.    $5.75M non-recurring fee;

13            b.    $70M with respect to securing the IFE systems contracts;

14            c.    $15M in out-of-pocket fees; and

15            d.    $150M for operating The Dubai Centers.

16       263.    Defendant Thales Avionics has paid only a single payment of $0.21M to Wamar

17  against the $240.75M plus it owes.

18       264.    As a result of Defendant Thales Avionics' intentional misrepresentations, Plaintiff

19  Wamar has been damaged in an amount of not less than $240M, the exact amount of which will be

20  proven at trial.

21                          **_SIXTH CAUSE OF ACTION_**

22                      **(Restitution; Unjust Enrichment against**

23              **Thales Avionics Regarding the Emirates Agreements)**

24       265.    Plaintiff Wamar incorporates the allegations set forth in paragraphs 1 through 264.

25       266.    Plaintiff Wamar and Defendant Thales Avionics entered into the January 2013

26  Letter of Intent, regarding the Emirates Airlines project, which is binding upon the parties.

27       267.    The January 2013 LOI was subject to only two conditions subsequent: 1) that

28  Emirates select Thales Avionics as sole supplier for IFE system products, support services, and

1  connectivity for certain aircraft; and 2) that Wamar and Thales Avionics reach mutual written

2  agreement on subcontracting terms and conditions, known as the SLA. As set out in the SLA,

3  Plaintiff Wamar was to also establish a The Dubai Centers.

4       268.   Plaintiff Wamar worked aggressively to promote Thales Avionics to Emirates for

5  the installation of Thales' IFE systems and technology services on multiple aircraft projects and

6  for Thales Avionics to be selected as the operator of The Dubai Centers.  Wamar worked for

7  years, and spent millions of its own dollars promoting Thales Avionics.  Wamar was successful

8  both in (a) securing contracts for Thales Avionics valued at approximately $975M plus for the

9  installation of IFE systems and technology services on Emirates aircraft, and (b) winning approval

10  from Emirates for Thales Avionics to operate the new The Dubai Centers.

11       269.   Defendant Thales Avionics should have paid Wamar $70M plus for it having

12  secured the $975M contract for them.

13       270.   Plaintiff Wamar incurred over $15M in out-of-pocket costs performing its

14  obligations under the January 2013 LOI and the SLA to establish The Dubai Centers.

15       271.   Pursuant to the January 2013 LOI, Defendant Thales Avionics and Plaintiff Wamar

16  were obligated to negotiate the terms of the SLA in good faith, pursuant to which Thales Avionics

17  would subcontract operating The Dubai Centers to Wamar. After Wamar obtained approval for

18  The Dubai Centers, however, Defendant Thales Avionics refused to sign the SLA.  Instead,

19  Defendant Thales Avionics elected to keep The Dubai Centers opportunity for itself.

20       272.   Plaintiff Wamar reasonably expected to earn $150M plus operating the new The

21  Dubai Centers during the 26-year term of the SLA.

22       273.   Defendant Thales Avionics seeks to unjustly enrich itself by acting in bad faith to

23  keep The Dubai Centers opportunity for itself rather than subcontract it to Wamar as agreed, thus

24  misappropriating money Wamar expected to earn operating the facility.

25       274.   Defendant is to earn more than $2B on the total amount of all the Emirates Airlines

26  contracts that Wamar has worked so hard to win.

27       275.   Plaintiff seeks disgorgement of all of the ill-gotten profits the Thales Group will

28  earn by operating The Dubai Centers, the exact amount of which will be proven at trial.

***SEVENTH CAUSE OF ACTION***

**(Intentional Interference with Contractual Relations against**

**Thales S.A. regarding the Emirates Agreements)**

276.    Plaintiff Wamar incorporates the allegations set forth in paragraphs 1 through 275.

277.    Plaintiff Wamar and Defendant Thales Avionics entered into the Emirates 2012 MOU and the January 2013 LOI, both of which are binding agreements (collectively the "Emirates Agreements").

278.    Pursuant to the Emirates Agreements, Plaintiff Wamar and Defendant Thales Avionics agreed to enter into the SLA upon agreement of the terms thereof, consistent with the principles of the Emirates 2012 MOU.

279.    Defendant Thales S.A. was aware of the Emirates Agreements for The Dubai Centers as both were part of the contract between Thales and Emirates.

280.    Defendant Thales S.A. was aware that the bulk of the fees and compensation that Thales Avionics would owe Wamar under the Emirates Agreements were contingent on Wamar being approved as a KIP.

281.    Defendant Thales S.A. had already approved Wamar as a KIP in 2012 for a three year term.  Thales S.A. knew that Wamar was to be re-qualified as a KIP by 2015.

282.    Defendant Thales establishes and controls the qualification criteria for KIP, performs the evaluation, and is the sole and final arbiter of who gets to be KIP and who does not. Thus, it has complete power over the process.

283.    As late as January 9, 2018, Thales Group executives personally falsely told Wamar senior management that Wamar was approved as a KIP and Wamar should continue performing under the Emirates Agreements with Thales.

284.    Plaintiff Wamar performed all its obligations under the Emirates Agreements by: (a) securing for Thales Avionics contracts valued at approximately $975M for the installation of IFE systems and technology services on Emirates aircraft; (b) establishing approval for Thales Avionics to operate The Dubai Centers; and (c) reaching written mutual agreement with Thales Avionics regarding terms of the SLA.

193117

58

COMPLAINT

285.    Defendant Thales S.A. intentionally manipulated the KIP re-qualification standard and process, and disingenuously refused to re-qualify Wamar as a KIP.

286.    On January 29, 2018, Roger Daix and Budin met with Wamar senior management and informed them that Thales would not approve Wamar as a KIP, would not sign the SLA, and as a consequence, Wamar would receive nothing for its efforts even though agreed-upon compensation was due.

287.    Wamar senior management objected to Thales S.A.'s bad faith.  In response, in a letter dated March 9, 2018, Dominique Giannoni, CEO of Thales InFlyt Experience, fell back on the excuse that Wamar failed to re-qualify as a KIP and that the SLA had not been signed.  Each of those events, however, was the result of bad faith manipulation of the process by Thales S.A.

288.    Mr. Giannoni's assertion that Wamar "does not meet the criteria to perform the project as normally expected from an industrial partner" was made in bad faith because Thales S.A. knows that Wamar has been a KIP for Thales Group in previous years, that Wamar provided all of the documents requested, and that Wamar was fully qualified to operate The Dubai Centers.

289.    Furthermore, Defendant Thales S.A.'s denial of Wamar's KIP re-qualification was a blatantly bad faith act designed to pass the entire risk and cost of establishing The Dubai Centers to Wamar with the intent to deny the KIP re-qualification once everything was in place and Thales Avionics could step in and take over the operations without the cost of paying Wamar what it had earned, and what it would earn operating The Dubai Centers during the 26-year term of the SLA.

290.    As a direct result of Defendant Thales S.A.'s interference and refusal to re-qualify Wamar as a KIP, Thales Avionics refused to perform under the Emirates Agreements by refusing to execute the SLA.

291.    As a direct result of Defendant Thales S.A.'s interference and refusal to re-qualify Wamar as a KIP, Thales Avionics refused to pay Wamar what it was owed under the Emirates Agreements.

292.    As a direct result of Defendant Thales S.A.'s interference and refusal to re-qualify Wamar as a KIP, Thales Avionics refused to subcontract the new The Dubai Centers to Wamar.

293.    Defendant Thales S.A.'s conduct was a substantial factor in causing Wamar harm.

1   If Thales S.A. had not interfered and manipulated the KIP re-qualification process in bad faith,

2   providing Thales Avionics with a convenient excuse to refuse to sign the SLA, Wamar would

3   have executed the SLA, received payment for the $975M (150) B777X aircraft contract, and been

4   selected as the subcontractor for The Dubai Centers.

5          294.    As a result of Defendant Thales S.A.'s intentional interference with Wamar's

6   contractual relations, Plaintiff Wamar has been damaged in an amount of not less than:

7          (a)     $70M with respect to securing the IFE systems contracts, and;

8          (b)     $150M with respect to establishing The Dubai Centers contract, of which the exact

9                  amount will be proven at trial.

10                          ***EIGHTH CAUSE OF ACTION***

11      **(Intentional Interference with Prospective Economic Relations against Thales S.A.**

12                      **Regarding the Emirates Agreements)**

13         295.    Plaintiff Wamar incorporates the allegations set forth in paragraphs 1 through 294.

14         296.    Plaintiff Wamar and Defendant Thales Avionics entered into the Emirates 2012

15   MOU and the January 2013 LOI, both of which are binding agreements upon the parties.

16   (Collectively the "Emirates Agreements").

17         297.    Pursuant to the Emirates Agreements, Plaintiff Wamar and Defendant Thales

18   Avionics agreed to enter into the SLA upon agreement of the terms thereof, consistent with the

19   principles of the Emirates 2012 MOU.

20         298.    Defendant Thales S.A. was aware of the Emirates Agreements and the obligation of

21   Thales Avionics to execute the SLA.

22         299.    Defendant Thales S.A. was aware that the SLA included a provision that Wamar

23   was required to be approved as a KIP.

24         300.    Defendant Thales S.A. was aware that Thales Avionics could refuse to execute the

25   SLA if Wamar was not re-qualified as a KIP.

26         301.    Defendant Thales S.A. had already approved Wamar as a worldwide KIP in 2012

27   for a three year term.  Thales S.A. knew that Wamar was to be re-qualified as a KIP by 2015.

28         302.    Defendant Thales establishes and controls the qualification criteria for KIP,

193117

1    performs the evaluation, and is the sole and final arbiter of who gets to be KIP and who does not.

2    Thus, it has complete power over the process.

3       303.   As late as January 9, 2018, Thales Group executives personally and falsely told

4    Wamar senior management that Wamar was approved as a KIP and Wamar should continue

5    performing under the Emirates Agreements.

6       304.   Plaintiff Wamar performed all its obligations under the Emirates Agreements by:

7    (a) securing for Thales Avionics contracts valued at approximately $975M plus for the installation

8    of IFE systems and technology services on Emirates aircraft; (b) establishing approval for Thales

9    Avionics to operate The Dubai Centers; and (c) reaching written mutual agreement with Thales

10   Avionics regarding terms of the SLA.

11      305.   Defendant Thales S.A. misrepresented to Wamar that Wamar would be re-qualified

12   as a KIP, thus inducing Wamar to continue performing under the January 2013 LOI.

13      306.   Defendant Thales S.A. intentionally manipulated the KIP re-qualification standard

14   and process, and disingenuously refused to re-qualify Wamar as a KIP.

15      307.   On January 29, 2018, Roger Daix and Budin met with Wamar senior management

16   and informed them that Thales would not approve Wamar as a KIP, would not sign the SLA, and

17   as a consequence, Wamar would receive nothing for its efforts even though agreed-upon

18   compensation was due.

19      308.   Wamar senior management objected to Thales S.A.'s bad faith.  In response, in a

20   letter dated March 9, 2018, Dominique Giannoni, CEO of Thales InFlyt Experience, fell back on

21   the excuse that Wamar failed to re-qualify as a KIP and that the SLA had not been signed.  Each

22   of those events, however, was the result of bad faith manipulation of the process by Thales S.A.

23      309.   Mr. Giannoni's assertion that Wamar "does not meet the criteria to perform the

24   project as normally expected from an industrial partner" was made in bad faith because Thales

25   S.A. knows that Wamar has been a world-wide KIP for Thales Group in previous years, that

26   Wamar provided all of the documents requested, and that Wamar was fully qualified to operate

27   The Dubai Centers.

28      310.   Defendant Thales S.A. created the excuse for Thales Avionics to refuse to execute

193117

1 │ the SLA by controlling and manipulating the KIP re-qualification process, and arbitrarily refusing

2 │ to re-qualify Wamar.

3 │     311.    As a direct result of Defendant Thales S.A.'s interference and refusal to re-qualify

4 │ Wamar as a KIP, Thales Avionics refused to perform under the Emirates Agreements by refusing

5 │ to execute the SLA.

6 │     312.    As a direct result of Defendant Thales S.A.'s interference and refusal to re-qualify

7 │ Wamar as a KIP, Thales Avionics refused to pay Wamar what it was owed under the Emirates

8 │ Agreements.

9 │     313.    As a direct result of Defendant Thales S.A.'s interference and refusal to re-qualify

10 │ Wamar as a KIP, Thales Avionics refused to subcontract the new The Dubai Centers to Wamar.

11 │     314.    Defendant Thales S.A.'s conduct was a substantial factor in causing Wamar harm.

12 │ If Thales S.A. had not interfered and manipulated the KIP qualification process in bad faith,

13 │ providing Thales Avionics with a convenient excuse to refuse to sign the SLA, Wamar would

14 │ have executed the SLA, received payment for the $975M plus IFE systems contract on Emirates

15 │ aircraft, and been selected as the subcontractor for The Dubai Centers.

16 │     315.    As a result of Defendant Thales S.A.'s intentional interference with Wamar's

17 │ prospective economic relations, Plaintiff Wamar has been damaged in an amount of not less than:

18 │     (a)    $70M with respect to securing the IFE systems installation contracts, and;

19 │     (b)    150M with respect to establishing The Dubai Centers contract, of which the exact

20 │     amount will be proven at trial.

21 │ ### *NINTH CAUSE OF ACTION*

22 │ **(Conspiracy to Commit Fraud against Thales S.A., Thales Avionics and Budin**

23 │ **Regarding the Emirates Agreements)**

24 │     316.    Plaintiff Wamar incorporates the allegations set forth in paragraphs 1 through 315.

25 │     317.    Plaintiff Wamar and Defendant Thales Avionics entered into the Emirates 2012

26 │ MOU and the January 2013 LOI, both of which are binding agreements upon the parties.

27 │ (Collectively the "Emirates Agreements").

28 │     318.    Pursuant to the Emirates Agreements, Plaintiff Wamar and Defendant Thales

193117

1   Avionics agreed to enter into the SLA upon agreement of the terms thereof, consistent with the

2   principles of the Emirates 2012 MOU.

3       319.    Pursuant to the January 2013 LOI, Wamar was required to re-qualify as a KIP.

4   Thales establishes and controls the qualification criteria for KIP, performs the evaluation, and is

5   the sole and final arbiter of who gets to be KIP and who does not.  Thus, it has complete power

6   over the process.

7       320.    Defendants Thales Avionics and Thales S.A. had a duty to Wamar to act in good

8   faith in establishing the KIP requirements and applying them to Wamar, particularly in the context

9   of the January 2013 LOI, the work and expenses they required Wamar to undertake, and the fact

10  that Wamar had recently been qualified as a world-wide KIP.

11      321.    Defendant Thales Avionics and Thales S.A., however, conspired to manipulate the

12  KIP re-qualification process.  Together, they and Budin repeatedly advised Wamar that it would

13  be re-qualified as a KIP, thus inducing Wamar to continue performing, to continue spending its

14  own money and resources until it had secured The Dubai Centers with the intent that once Wamar

15  had secured The Dubai Centers, Thales S.A. would deny Wamar its KIP status and keep The

16  Dubai Centers opportunity for itself.

17      322.    Defendants Thales Avionics, Thales S.A. and Budin knew, agreed, and worked in

18  concert to drag out the re-qualification process, to give encouragement to Wamar that it would be

19  qualified as a KIP, and to then deny KIP status with the intent to cheat Wamar out of operating

20  The Dubai Centers.

21      323.    As a result of Defendants Thales S.A.'s, Thales Avionics' and Budin's conspiracy

22  to act in bad faith defraud Wamar out of the opportunity to be the sole subcontractor of The Dubai

23  Centers, Plaintiff Wamar has been damaged in an amount of not less than:

24      (a)    $70M with respect to securing the IFE systems contracts, and;

25      (b)    $150M with respect to establishing The Dubai Centers contract, of which the exact

26      amount will be proven at trial.

27

28

1                ***TENTH CAUSE OF ACTION***

2    **(Aiding and Abetting Intentional Misrepresentation against Thales S.A. and Budin**

3               **Regarding the Emirates Agreements)**

4       324.     Plaintiff Wamar incorporates the allegations set forth in paragraphs 1 through 323.

5       325.     Plaintiff Wamar and Defendant Thales Avionics entered into the Emirates 2012

6 MOU and the January 2013 LOI, both of which are binding agreements upon the parties.

7 (Collectively the "Emirates Agreements").

8       326.     Pursuant to the Emirates Agreements, Plaintiff Wamar and Defendant Thales

9 Avionics agreed to enter into the SLA upon agreement of the terms thereof, consistent with the

10 principles of the Emirates 2012 MOU.

11       327.     Defendant Thales Avionics was required to pay Wamar a KIP Royalty equal to

12 6.4% of the value of the contracts Wamar secured for the installation of Thales IFE systems and

13 technology services on Emirates aircraft. Thales Avionics and Thales S.A., however, cooperated

14 in intentionally misleading Wamar by promising to pay the 6.4% KIP Royalty, but refusing to put

15 the promise into a written document, intending to, and actually denying the obligation.

16       328.     Defendant Thales S.A. knew that the representations were false when made, yet

17 provided substantial assistance to Thales Avionics by showing Wamar senior management the

18 calculations and assuring them that Wamar would be paid accordingly, thus inducing Wamar to

19 continue performing at its own cost and to its detriment.

20       329.     Furthermore, pursuant to the January 2013 LOI, Wamar was required to re-qualify

21 as a KIP. Wamar's re-qualification as a KIP was a condition to the SLA. Thales establishes and

22 controls the qualification criteria for KIP, performs the evaluation, and is the sole and final arbiter

23 of who gets to be KIP and who does not. Thus, it has complete power over the process.

24       330.     From and after the execution of the January 2013 LOI, Thales Avionics, Thales

25 S.A., and Budin peddled false representations regarding Wamar's pending re-qualification as a

26 KIP. Early in the process, Thales Avionics assured Wamar and Wamar senior management that

27 Wamar would be re-qualified. Later in the process, Thales S.A. assured Wamar that KIP re-

28 qualification was complete. Thales S.A. knew that Thales Avionics was engaged in false

1  representations.  Even though Thales S.A. knew the representations were false, Thales S.A.

2  provided substantial assistance to Thales Avionics by, among other things, dragging out the

3  process to keep Wamar engaged and performing at its own cost, and by assuring Wamar that the

4  decision was finalized and the KIP would be renewed.

5        331.  In addition, Defendant Thales Avionics made representations to Wamar that it

6  would sign the SLA and subcontract operations of the Dubai IFE Repair and the Discovery

7  Innovation Dubai Centers to Wamar.  Thales S.A. and Budin knew those representations were

8  false.  Nevertheless, Thales S.A. and Budin provided substantial assistance to Thales Avionics by

9  (a) dragging out the process to keep Wamar engaged and performing at its own cost, (b) assuring

10  Wamar that the decision was finalized and the KIP would be renewed, and (c) refusing to certify

11  Wamar as a KIP, giving Thales Avionics and excuse to refuse to sign the SLA and thereby refuse

12  to subcontract operation of The Dubai Centers to Wamar.

13        332.  As a result of Defendant Thales S.A.'s acts to aid and abet Thales Avionics' false

14  representations to Wamar, Plaintiff Wamar has been damaged in an amount of not less than:

15        (a)  $70M with respect to securing the IFE systems contracts, and;

16        (b)  $150M with respect to establishing The Dubai Centers contract, of which the exact

17        amount will be proven at trial.

18  **_ELEVENTH CAUSE OF ACTION_**

19  **(Aiding and Abetting Breach of the Implied Covenant of Good Faith and Fair Dealing**

20  **against Thales S.A. Regarding the Emirates Agreements)**

21        333.  Plaintiff Wamar incorporates the allegations set forth in paragraphs 1 through 332.

22        334.  Plaintiff Wamar and Defendant Thales Avionics entered into the Emirates 2012

23  MOU and the January 2013 LOI, both of which are binding agreements upon the parties.

24  (Collectively the "Emirates Agreements").

25        335.  Pursuant to the Emirates Agreements, Plaintiff Wamar and Defendant Thales

26  Avionics agreed to enter into the SLA upon agreement of the terms thereof, consistent with the

27  principles of the Emirates 2012 MOU.

28        336.  In California, the law implies in every contract a covenant of good faith and fair

193117

1  dealing. That covenant requires that neither party do anything which will deprive the other of the

2  benefits of the agreement and not to act in bad faith toward the other contracting party by

3  misleading the other party or by concealing important information from the other party.

4    337.    Pursuant to the January 2013 LOI, Wamar was required to re-qualify as a KIP.

5  Thales establishes and controls the qualification criteria for KIP, performs the evaluation, and is

6  the sole and final arbiter of who gets to be KIP and who does not.  Thus, it has complete power

7  over the process.

8    338.    Defendant Thales Avionics had a duty to Wamar to act in good faith in establishing

9  the KIP requirements and applying them to Wamar, particularly in the context of the January 2013

10  LOI, the work and expenses they required Wamar to undertake, and the fact that Wamar had

11  already been qualified as a world-wide KIP previously.

12    339.    Defendants Thales S.A. and Budin knew Thales Avionics had a duty to act in good

13  faith, but elected to assist Thales Avionics in violating its covenant.  Together, they repeatedly

14  advised Wamar that it would be re-qualified as a KIP, thus inducing Wamar to continue

15  performing, to continue spending its own money and resources until it had secured The Dubai

16  Centers with the intent that once Wamar had secured The Dubai Centers, Thales S.A. would deny

17  Wamar its KIP status and keep The Dubai Centers opportunity for itself.

18    340.    Defendants Thales Avionics, Thales S.A. and Budin knew, agreed, and worked in

19  concert to drag out the re-qualification process, to give encouragement to Wamar that it would be

20  re-qualified as a KIP, and to then deny KIP status with the intent to cheat Wamar out of operating

21  The Dubai Centers.

22    341.    In addition, Thales Avionics was required to pay Wamar a KIP Royalty equal to

23  6.4% of the value of the contracts Wamar senior management and Wamar secured for the

24  installation of Thales IFE systems and technology services on Emirates aircraft.  Thales Avionics

25  and Thales S.A., however, cooperated in intentionally misleading Wamar by promising to pay the

26  6.4%, but refusing to put the promise into a written document, intending to, and actually denying

27  the obligation.

28    342.    Defendant Thales S.A. knew that the representations were false when made, yet

193117                                    66
                                   COMPLAINT

1 | provided substantial assistance to Thales Avionics by showing Wamar senior management the

2 | calculations and falsely assuring that Wamar would be paid accordingly, thus inducing Wamar to

3 | continue performing at its own cost and to its detriment.

4 |     343.   As a result of Defendant Thales S.A.'s and Budin's aiding and abetting Thales

5 | Avionics' violation of its covenant to act in good faith, Plaintiff Wamar has been damaged in an

6 | amount of not less than:

7 |     (a)   $70M with respect to securing the IFE systems contracts, and;

8 |     (b)   $150M with respect to establishing The Dubai Centers contract, the exact amount

9 |     of which will be proven at trial.

10 | ***TWELFTH CAUSE OF ACTION***

11 | **(Quantum Meruit)**

12 |     344.   Plaintiff Wamar incorporates the allegations set forth in paragraphs 1 through 343.

13 |     345.   Before Thales hired Wamar to assist it in securing IFE system business in the

14 | Middle East, Thales was floundering.  Thales had a zero percent (0%) market share of the Middle

15 | East IFE system business and nothing to show for its efforts but failure.  Today, as a result of

16 | Wamar's efforts, Thales has a sixty percent (60%) Middle East market share.

17 |     346.   As discussed above, Wamar and Thales entered into a series of consultancy

18 | agreements pursuant to which Thales agreed to pay Wamar if Wamar's efforts resulted in Thales

19 | obtaining IFE system contracts with Middle East airlines.  Wamar's efforts have resulted in Thales

20 | booking over $700M confirmed contracts with options for another $1.13B for A380 (40+ AC),

21 | B777X (100) and B787 (40) at Emirates alone, plus connectivity and service that are worth over

22 | $100M. Plus, Kuwait Airlines ($16.5M) and Turkish Airlines ($61M).

23 |     347.   In addition, Wamar established The Dubai Centers worth at least $150M to Wamar,

24 | and substantially more to Thales.  The value of The Dubai Centers was so great that Thales

25 | fraudulently stole that opportunity from Wamar to keep it for itself.

26 |     348.   Wamar has contracts establishing its right to payment.  To the extent, however, that

27 | the Court believes there is any doubt about the validity of any of the contracts, Wamar has shown

28 | that its services were rendered under an understanding and expectation by both parties that

1  compensation for Wamar's efforts was to be made - at least that was the case until Thales decided

2  it would simply rather not pay anything for the sixty percent (60%) Middle East IFE business

3  market share Wamar helped it secure.

4       349.    At all times, Wamar was acting in accordance with instructions from Thales.

5  Thales instructed Wamar to perform the services, was kept informed of Wamar's activities and

6  enjoyed the benefit of Wamar's services as its Middle East IFE system market share rose from

7  zero percent to sixty percent.  The services Wamar provided were intended solely to benefit

8  Thales, and in fact have greatly benefitted Thales.  Wamar provided valuable services and Thales

9  retained their benefit with full appreciation of the facts.  Under these circumstances, it would be

10  inequitable for Thales to retain the benefit without payment to Wamar of its reasonable value.

11      350.    Wamar senior management has seven (7) years' of text messages and "What's App"

12  messages documenting the instructions from Thales and acknowledgements of the value of the

13  services performed by Wamar.  Wamar has documentary proof of the agreed-upon value of its

14  services, including a 6.4% KIP Royalty.

15      351.    Accordingly, at a minimum, Wamar is entitled to recover the reasonable value of

16  the services rendered in an amount of not less than:

17      (a)    $5.75M for Wamar's non-recurring fee regarding the January 2013 LOI with

18      Emirates;

19      (b)    $15M for Wamar's out-of-pocket costs to obtain the Emirates contracts;

20      (c)    $70M with respect to securing the IFE systems contracts, and

21      (d)    $150M with respect to establishing The Dubai Centers contract, the exact amount

22      of which will be proven at trial.

23                     ***THIRTEENTH CAUSE OF ACTION***

24                          **(RICO Against All Defendants)**

25      352.    Plaintiff Wamar incorporates the allegations set forth in paragraphs 1 through 351.

26      353.    The Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §1961 et seq.)

27  ("RICO") declares it unlawful to use or invest income from "a pattern of racketeering activity"

28  and the establishment, operation or acquisition of an interest in any enterprise engaged in or

affecting interstate or foreign commerce, "through a pattern of racketeering activity...."  The racketeering activity engaged in by defendants, and each of them, includes, but is not limited to mail and wire fraud, extortion, and money laundering.

    *A.*    ***Wire and Mail Fraud 18 U.S.C. §§ 1341 & 1343***

    354.    Defendants, and each of them, through the use of mail and wire services, including the United States mail, and through electronic wire transmissions (telephone) and electronic mail (e-mail) used false and misleading statements to fraudulently induce Wamar to pursue contracts on behalf of the defendants, causing significant financial damage to Wamar because the defendants did not intend to pay, and in fact have not paid, the amounts earned under the contracts.

    355.    The defendants engaged in further wire fraud and mail fraud in connection with false and fraudulent promises made regarding qualifying Wamar as a KIP.

    356.    On May 15, 2017, Phillippe Desclaudure falsely advised Harald Zirngibl by phone that "the decision was finalized to continue with Wamar and that the KIP will soon be renewed."

    357.    On August 8, 2017, Shagha Thuruthiyil of Thales Group e-mailed Wamar to advise that "in order to complete and finalize the KIP process, we need the below mentioned docs..." Wamar provided all six of the requested documents, but KIP approval was denied.

    358.    Thales continued its fraudulent scheme to drag out the KIP process while Wamar expended its money preparing The Dubai Centers before denying the KIP and stealing the opportunity to itself.  On September 13, 2017, George Ermenidis e-mailed Wamar stating that "We've assessed the documents you've sent us and consider that the qualification of Wamar International LLC is in a good way for our final approval."  However, notwithstanding the prior communication from Thales identifying the 6 specific documents needed to finalize the KIP process, Mr. Ermenidis demanded eight (8) additional documents.

    359.    Wamar provided all of the requested documents (except the audited financials, for which Thales accepted non-audited financials).

    360.    On October 25, 2017, Harald Zirngibl sent a "Non Objection Confirmation" letter to George Ermenidis to confirm Thales support for the Dubai Branch. George Ermenidis confirmed the receipt of this email on the same day. However, George Ermenidis did not update

1    Wamar on the progress of approval as noted in emails sent by Wamar to George Ermenidis on

2    November 2, 2017, and November 6, 2017. Jean-Pierre Pourre sent an email to Wamar on

3    November 7, 2017, to inform Wamar George Ermenidis had been out of town and that there are

4    been an issue with the "Non Objection Confirmation" letter.

5         361.    On November 9, 2017, Jean-Pierre Pourre sent an email to Wamar providing

6    Wamar with the latest version of the Service Level Agreement resulting from the intensive

7    discussions and negotiations held between Wamar and Thales Avionics, and requested that Wamar

8    provide a Best and Final Proposal detailing the pricing and associated terms and conditions under

9    which Wamar would agree to deliver the proposed services to Thales.

10        362.    On November 20, 2017, Jean-Pierre Pourre an email detailing that the meeting

11   regarding the KIP and the SLA "actions" about key subjects. In that email, Jean-Pierre Pourre

12   stated that the number one priority of Thales was to complete "Wamar KIP Qualification".

13   Furthermore, Jean-Pierre Pourre stated that regarding the letter to complete the UAE Branch

14   creation, "the action is now on my side".

15        363.    On November 21, 2017, Jean-Pierre Pourre sent an email to Wamar that Jean-Pierre

16   Pourre would again "take care of the letter", and informing Wamar that the letter must be provided

17   by Thales Inflyt, not Thales Middle East.

18        364.    On November 29, 2017, Jean-Pierre Pourre sent an email to Wamar stating that the

19   "Letter is progressing", and I hope to get it to you by end of this week or latest early next week.

20        365.    On February 6, 2018 Wamar emailed Thales Inflyt Head of Operations Philippe

21   Desclaudure to confirm that Thales Management had decided to operate the Dubai IFE Repair

22   Center themselves, and refused to reward it to Wamar as promised previously.  Philippe

23   Desclaudure acknowledged that this was "disappointing", in a response email, and also stated that

24   it "should not overshadow the very good relationship and trust between us."

25        366.    By March 2018, Wamar had obtained all necessary permits for The Dubai Centers,

26   hired staff, secured a lease for The Dubai Centers premises and worked with Thales to design the

27   space. The project was ready to go. Accordingly, on March 9, 2018, Thales completed its

28   fraudulent scheme. Dominique Giannoni, Thales InFlyt Experience's CEO, e-mailed and mailed a

1   letter to Wamar asserting that "WAMAR does not meet the criteria to perform the project as

2   normally expected from an industrial partner in charge of such a project.  This is the reason why

3   we made the strategic decision not to continue with WAMAR for the said project and to have it

4   achieved by Thales (sic) own means."

5          367.    Thus, Thales used wire and mail (in addition to phone and in-person meetings) to

6   string Wamar along, telling Wamar KIP approval was forthcoming, while in fact Thales was

7   fraudulently inducing Wamar to establish The Dubai Centers at Wamar's own cost until The Dubai

8   Centers were ready and Thales could execute its plan and steal a $150M opportunity from Wamar.

9          **B.      *Money Laundering 18 U.S.C. § 1956*

10         368.    In addition, as described above in paragraphs 121, 122, 136-139 and 162, the

11  defendants engaged in racketeering activity by forcing Wamar into a money-laundering scheme in

12  violation of 19 U.S.C. §1956, pursuant to which the defendants required Wamar to engage in a

13  spare-parts distributorship scheme so that the defendants could conceal or disguise the nature and

14  source of payment obligations arising from contracts between Thales and Wamar, with the intent

15  of hiding such transactions and money transfers from U.S. and French investigators.  Thales was

16  aware that using companies owned by Wamar senior management as both a business advisor and

17  KIP violated French and potentially U.S. laws.  The money paid to Wamar and contracted to be

18  paid to Wamar under the distributorship arrangements was intentionally diverted from money

19  earned by Wamar senior management acting as TABA and Wamar.  Thales knew that its

20  arrangements with Wamar senior management violated French and potentially U.S. laws, and

21  therefore coerced Wamar senior management into the spare-parts distributorship agreement for the

22  express purpose of hiding its unlawful arrangements.

23         369.    These violations together with defendants' other conduct and acts, both intrastate

24  and interstate, constitute a continuing pattern of racketeering activity under the meaning of 18

25  U.S.C. §1961.  Moreover, Wamar has no reason to believe that the defendants have or will cease

26  in this pattern of alleged activity as herein described.

27         370.    The conduct of the defendants, and each of them, affected interstate commerce by

28  using wires, mails or other instruments and interstate methods of communications so to aid, abet

1   and assist in this fraudulent conduct and so to commit fraud and to deceive Wamar.

2        371.    Pursuant to RICO, Wamar is entitled to threefold damages for each offense so

3   established, and for attorneys' fees and costs as allowed under 18 U.S.C. 1964(c).  The conduct of

4   the defendants, and each of them, has proximately damaged Wamar in an amount that is currently

5   unknown but believed to exceed $240M, according to proof at time of trial.

6                        *FOURTEENTH CAUSE OF ACTION*

7        **(Declaratory Relief against Thales Avionics Regarding the Emirates Agreements)**

8        372.    Plaintiff Wamar incorporates the allegations set forth in paragraphs 1 through 371.

9        373.    Plaintiff Wamar has secured over $2B in valuable contracts for Thales Avionics,

10  yet Thales Avionics refuses to pay Wamar the fees it has earned.

11       374.    Plaintiff Wamar is entitled to a 6.4% KIP Royalty of the value of contracts Wamar

12  secure for Thales Avionics for installation of IFE systems and technology services on Emirates

13  aircraft.

14       375.    Wamar senior management has been assured by Emirates that Thales Avionics (a)

15  will be selected for the (56) A380 projects described in the Emirates Agreement with a contract

16  value of approximately $400M plus and (b) will be selected for installation of IFE systems and

17  technology services on (150) B777X aircraft with a contract value of approximately $975M plus.

18  Wamar's KIP Royalty fee is approximately $25.6M for the A380 project and $70M plus for the

19  B777X project, in addition to $3M in consulting fees for each of the preceding contracts ($6M

20  total).  The $70M plus for the B777X project is also included in causes of action one to eleven, so

21  this Cause of Action Fourteen seeks only any amount of the $70M plus which is not awarded

22  under other causes of action.

23       376.    Further, with the encouragement of Roger Daix in particular, and Thales S.A. and

24  Thales Avionics in general, Wamar continues to work to secure the contract for Thales Avionics to

25  install IFE systems on (40) B787 aircraft.  The total expected value of the (40) B787 contract is

26  $200M.  If the contract is secured, Wamar's 6.4% KIP Royalty fee will be approximately $12.8M,

27  in addition to $3M in consulting fees per contract

28       377.    Thales Group companies have an established history of breaching their agreements

with Plaintiff Wamar and refusing to pay Wamar the fees it has earned.  Without relief from the Court, the Thales Group is likely to continue that behavior.  Wamar is entitled to declaratory judgment, that upon delivery of contracts for the B777X aircraft, the A380 aircraft and/or the B787 aircraft, Thales Avionics is required to pay Wamar its KIP Royalty fee in the amount of 6.4% of the total contract value, or approximately $117.4M (less any amount of the $70M plus which is awarded under other causes of action).

## V. PRAYER

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, for $240.75M in actual damages, subject to proof at the time of trial, $720M in exemplary damages, and $720M in RICO damages as follows:

1.   $5.75M, subject to proof at the time of trial for Wamar's non-recurring fee regarding the January 2013 LOI with Emirates, under the following causes of action:

   a.   First Cause of Action - Breach of Contract by Thales Avionics

   b.   Second Cause of Action - Intentional Misrepresentation by Thales Avionics

   c.   Third Cause of Action - Negligent Misrepresentation by Thales Avionics

   d.   Fourth Cause of Action - Intentional Misrepresentation by Thales S.A.

   e.   Fifth Cause of Action - Breach of Implied Covenant of Good Faith and Fair Dealing by Thales Avionics

   f.   Sixth Cause of Action - Restitution; Unjust Enrichment by Thales Avionics

   g.   Seventh Cause of Action - Intentional Interference with Contractual Relations by Thales S.A.

   h.   Eighth Cause of Action - Intentional Interference with Prospective Economic Relations by Thales S.A.

   i.   Ninth Cause of Action - Conspiracy by Thales S.A. and Thales Avionics

   j.   Tenth Cause of Action – Aiding and Abetting Intentional Misrepresentation by Thales S.A.

   k.   Eleventh Cause of Action – Aiding and Abetting Breach of the Implied

1     Covenant of Good Faith and Fair Dealing by Thales S.A.

2          l.      Twelfth Cause of Action – Quantum Meruit.

3     2.    $70M, subject to proof at the time of trial, for Wamar successfully securing the

4           $975M IFE systems contract with Emirates, under the following causes of action:

5           a.      First Cause of Action - Breach of Contract by Thales Avionics

6           b.      Second Cause of Action - Intentional Misrepresentation by Thales Avionics

7           c.      Third Cause of Action - Negligent Misrepresentation by Thales Avionics

8           d.      Fourth Cause of Action - Intentional Misrepresentation by Thales S.A.

9           e.      Fifth Cause of Action - Breach of Implied Covenant of Good Faith and Fair

10                  Dealing by Thales Avionics

11          f.      Sixth Cause of Action - Restitution; Unjust Enrichment by Thales Avionics

12          g.      Seventh Cause of Action - Intentional Interference with Contractual

13                  Relations by Thales S.A.

14          h.      Eighth Cause of Action - Intentional Interference with Prospective

15                  Economic Relations by Thales S.A.

16          i.      Ninth Cause of Action - Conspiracy by Thales S.A. and Thales Avionics

17          j.      Tenth Cause of Action – Aiding and Abetting Intentional Misrepresentation

18                  by Thales S.A.

19          k.      Eleventh Cause of Action – Aiding and Abetting Breach of the Implied

20                  Covenant of Good Faith and Fair Dealing by Thales S.A.

21          l.      Twelfth Cause of Action – Quantum Meruit.

22    3.    $15M, subject to proof at the time of trial, for Wamar's out-of-pocket costs to

23          obtain the Emirates contracts, under the following causes of action:

24          a.      First Cause of Action - Breach of Contract by Thales Avionics

25          b.      Second Cause of Action - Intentional Misrepresentation by Thales Avionics

26          c.      Third Cause of Action - Negligent Misrepresentation by Thales Avionics

27          d.      Fourth Cause of Action - Intentional Misrepresentation by Thales S.A.

28          e.      Fifth Cause of Action - Breach of Implied Covenant of Good Faith and Fair

1        Dealing by Thales Avionics

2        f.      Sixth Cause of Action - Restitution; Unjust Enrichment by Thales Avionics

3        g.      Seventh Cause of Action - Intentional Interference with Contractual

4                Relations by Thales S.A.

5        h.      Eighth Cause of Action - Intentional Interference with Prospective

6                Economic Relations by Thales S.A.

7        i.      Ninth Cause of Action - Conspiracy by Thales S.A. and Thales Avionics

8        j.      Tenth Cause of Action – Aiding and Abetting Intentional Misrepresentation

9                by Thales S.A.

10       k.      Eleventh Cause of Action – Aiding and Abetting Breach of the Implied

11               Covenant of Good Faith and Fair Dealing by Thales S.A.

12       l.      Twelfth Cause of Action – Quantum Meruit.

13   4.  $150M, subject to proof at the time of trial, for Wamar establishing and operating

14       the new The Dubai Centers during the 26-year term of the SLA, under the

15       following causes of action:

16       a.      First Cause of Action - Breach of Contract by Thales Avionics

17       b.      Second Cause of Action - Intentional Misrepresentation by Thales Avionics

18       c.      Third Cause of Action - Negligent Misrepresentation by Thales Avionics

19       d.      Fourth Cause of Action - Intentional Misrepresentation by Thales S.A.

20       e.      Fifth Cause of Action - Breach of Implied Covenant of Good Faith and Fair

21               Dealing by Thales Avionics

22       f.      Sixth Cause of Action - Restitution; Unjust Enrichment by Thales Avionics

23       g.      Seventh Cause of Action - Intentional Interference with Contractual

24               Relations by Thales S.A.

25       h.      Eighth Cause of Action - Intentional Interference with Prospective

26               Economic Relations by Thales S.A.

27       i.      Ninth Cause of Action - Conspiracy by Thales S.A. and Thales Avionics

28       j.      Tenth Cause of Action – Aiding and Abetting Intentional Misrepresentation

193117

75

COMPLAINT

1        by Thales S.A.

2        k.    Eleventh Cause of Action – Aiding and Abetting Breach of the Implied

3              Covenant of Good Faith and Fair Dealing by Thales S.A.

4        l.    Twelfth Cause of Action – Quantum Meruit.

5    5.  $720M minimum punitive damages, under causes of action:

6        a.    Second Cause of Action - Intentional Misrepresentation by Thales Avionics

7        b.    Third Cause of Action - Negligent Misrepresentation by Thales Avionics

8        c.    Fourth Cause of Action - Intentional Misrepresentation by Thales S.A.

9        d.    Seventh Cause of Action - Intentional Interference with Contractual

10             Relations by Thales S.A.

11       e.    Eighth Cause of Action - Intentional Interference with Prospective

12             Economic Relations by Thales S.A.

13       f.    Ninth Cause of Action - Conspiracy by Thales S.A. and Thales Avionics

14       g.    Tenth Cause of Action – Aiding and Abetting Intentional Misrepresentation

15             by Thales S.A.

16       h.    Eleventh Cause of Action – Aiding and Abetting Breach of the Implied

17             Covenant of Good Faith and Fair Dealing by Thales S.A.

18   6.  $720M minimum damages under cause of action Thirteen for RICO violations.

19   7.  As set forth above, at a minimum, Wamar is owed $240M in actual damages.

20   8.  As set forth above, at a minimum, Wamar is owed $720M in punitive and

21       exemplary damages.

22   9.  As set forth above, at a minimum Wamar is owed $720 in RICO damages.

23   10. Accordingly, at a minimum Defendant owes Wamar $1.680B.

24   11. On the Fourteenth Cause of Action for Declaratory Judgment that

25       a.    Wamar is entitled to its 6.4% KIP Royalty fee upon delivery of the

26             contracts described in the Fourteenth Cause of Action in the approximate

27             amount of $108M (less any portion of the $70M plus awarded under other

28             causes of action), and

193117

76

COMPLAINT

1         b.    Wamar is entitled to its consulting fees upon the award of the contracts

2              described in the Fourteenth Cause of Action in the approximate amount of

3              $9M.

4    12.    For interest as provided by law and/or in an amount according to proof at trial.

5    13.    For other foreseeable damages in an amount according to proof at trial.

6    14.    For costs of suit incurred herein.

7    15.    For such other and further relief as the Court may deem just and proper.

8                    **REQUEST FOR JURY TRIAL**

9    Plaintiff Wamar demands a trial by jury on all issues so triable.

10

11  DATED:  November 8, 2018        THOMAS WHITELAW & KOLEGRAFF LLP

12

13

14                       By:       */s/ Joseph E. Thomas*

                              JOSEPH E. THOMAS

15                            WILLIAM J. KOLEGRAFF

                            WILLIAM S. SANDERSON

16                            Attorneys for Plaintiff WAMAR

                            INTERNATIONAL, LLC

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

# THALES

In-Flight Entertainment and Connectivity
Thales Avionics, Inc
58 Discovery
Irvine, California 92618-3105
USA
Tel. +1 949-790-2500
www.thalesgroup.com

Wamar International LLC                                          January 14, 2013
Attn: Nabil Barakat, President & CEO
1919 Williams St. Suite 310
Simi Valley, CA 93065, USA

**Subject: Letter of Intent Regarding Selection of Wamar International LLC**

Dear Mr. Barakat,

Following the Memorandum of Understanding dated December 21, 2012 ("MoU") between Thales Avionics, Inc. ("Thales") and Wamar International LLC ("Wamar"), Thales would like to thank you for Wamar's quotation reference WAM/TAI/MOU/001/13 dated January 13, 2013 in support of the Project (as defined hereinafter).

Although this Wamar's quotation remains to be discussed between the parties, Thales is pleased to confirm that it intends to select Wamar as a subcontractor for the Project, subject to the following conditions:

- Emirates Airline Company PJSC ("Customer") selects Thales as the sole supplier of all in-flight entertainment products, support services, and connectivity for the Customer's fleet of fifty (50) firm B777 aircraft and thirty-two (32) firm A380 aircraft pursuant to the Customer's request for proposal dated June 14, 2012 (Ref: EK-A380/B777-IFE-2012-016) and Thales's proposal dated August 7, 2012 (Ref: D12-00060) and its subsequent revisions in response thereto, (collectively, "Project"); and

- Thales and Wamar reach mutual written agreement on the subcontracting terms and conditions, including but not limited to scope, pricing and allocation of risks and responsibilities in accordance with the principles set out in the MoU.

In case the Customer select Thales for one (1) fleet only (B777 or A380) a new quotation will be agreed between Thales and Wamar in accordance with the principle of the MoU but on the basis of a revised and down sized Statement of Work.

This letter of Intent shall automatically expire upon the signature of the subcontract between Thales and Wamar or ninety (90) days after the date on which the Customer awards the Project to Thales or upon notification from the Customer that Thales is not selected for the Project, whichever occurs earlier.

In a spirit of goodwill and cooperation, Thales looks forward to working with Wamar to meet and exceed the Customer's expectations for the Project. We kindly request that you sign and date this letter as indicated below.

Sincerely,                                              Acknowledged and Agreed,

William HUOT-MARCHAND                                   Nabil BARAKAT
Vice president Global Sales & Marketing                 President & CEO
GM international, International Operations               Wamar International LLC
Thales In-flight Entertainment & Connectivity           Dated: _____



**apex**          2010 – 2011 Avion Award          2011 Crystal Cabin
                  Best in Technology Winner        Award Winner

# THALES

**In-Flight Entertainment and Connectivity**
Thales Avionics, Inc.
58 Discovery
Irvine, California 92618-3105
USA
Tel: +1 949-790-2500
www.thalesgroup.com

## POWER OF ATTORNEY

To Whom It May Concern:

I, Alan Pellegrini, President, Thales Avionics, Inc., do hereby duly appoint the following named person, William Huot-Marchand, VP & General Manager, International Operations, to act as my attorney in fact to execute the following document between Wamar International L.L.C., and Thales Avionics, Inc.:

- Letter of Intent regarding selection of Wamar International L.L.C. as a subcontractor for consulting services and strategy support to include the Dubai Discovery Centre as part of Thales Avionics, Inc.'s In-Flight Entertainment and Connectivity proposal to Emirates

Giving and granting to said attorney full power and authority to do all and every act and thing whatsoever requisite and necessary to be done relative to the above as fully to all intents and purposes as I might or could do if personally present.

All that said attorney shall lawfully do or cause to be done under the authority of this power of attorney is expressly approved.

Dated: ___January 14, 2013___     Signed: _____

Alan Pellegrini
President


2010–2011 Avion Award
Best in Technology Winner


2011 Crystal Cabin
Award Winner

# SUPERIOR COURT OF CALIFORNIA

### COUNTY OF ORANGE

**Superior Court of California, County of Orange**

751 W. Santa Ana Blvd
Santa Ana, CA 92701

**PAYMENT RECEIPT**

**E-Filing Transaction #:** 4906326

**Receipt #:** 12276095

| **Clerk ID:** gramirez | **Transaction No:** 12452403 | **Transaction Date:** 11/14/2018 | **Transaction Time:** 11:42:17 AM |
| --- | --- | --- | --- |

| Case Number | Fee Type | Qty | Fee Amount$ | Balance Due | Amount Paid | Remaining Balance |
| --- | --- | --- | --- | --- | --- | --- |
| 30-2018-01031861-CU-BC-CXC | 194 - Complaint or other 1st paper | 1 | $435.00 | $435.00 | $435.00 | $0.00 |
| 30-2018-01031861-CU-BC-CXC | 34 - Complex Case Fee - Plaintiff | 1 | $1,000.00 | $1,000.00 | $1,000.00 | $0.00 |
| | | | | Sales Tax: | $0.00 | |
| | | | | **Total:** | **$1,435.00** | Total Rem. Bal: **$0.00** |

E-Filing :  - OneLegal

E-Filing:  $1,435.00

Total Amount Tendered:  $1,435.00

Change Due:  **$0.00**

Balance:  **$0.00**

A $45 fee may be charged for each returned check, electronic funds transfer or credit card payment.

# ORIGINAL

# SUPERIOR COURT OF CALIFORNIA

**ORANGE**

**751 W. Santa Ana Blvd**

**Santa Ana , CA 92701**

**(657) 622-5300**

**www.occourts.org**

## NOTICE OF CASE ASSIGNMENT

Case Number: **30-2018-01031861-CU-BC-CXC**

Your case has been assigned for all purposes to the judicial officer indicated below. A copy of this information must be provided with the complaint or petition, and with any cross-complaint that names a new party to the underlying action.

| ASSIGNED JUDGE | COURT LOCATION | DEPARTMENT/ROOM | PHONE |
|---|---|---|---|
| Hon.<br>Glenda Sanders | Civil Complex Center | CX101 | (657) 622-5300 |
| Hearing: | Date: | Time: | |
| **JUDGE** | **COURT LOCATION** | **DEPARTMENT/ROOM** | **PHONE** |
| Hon. | | | |

[ x ]  ADR Information attached.

# SCHEDULING INFORMATION

**Judicial Scheduling Calendar Information**

Individual courtroom information and the items listed below may be found at: www.occourts.org.

Case Information, Court Local Rules, filing fees, forms, Civil Department Calendar Scheduling Chart, Department phone numbers, Complex Civil E-filing, and Road Map to Civil Filings and Hearings.

**Ex Parte Matters**

Rules for Ex Parte Applications can be found in the California Rules of Court, rules 3.1200 through 3.1207 at: www.courtinfo.ca.gov.  Trials that are in progress have priority; therefore, you may be required to wait for your ex parte hearing.

**Noticed Motions**

\* The following local Orange County Superior Court rules are listed for your convenience:
 - Rule 307 - Telephonic Appearance Litigants - Call CourtCall, LLC at (310) 914-7884 or (888) 88-COURT.
 - Rule 380 - Fax Filing, Rule 450 - Trial Pre-Conference  (Unlimited Civil)
\* All Complex Litigation cases are subject to mandatory Electronic Filing, unless excused by the Court.
\* Request to Enter Default and Judgment are strongly encouraged to be filed as a single packet.

**Other Information**

Hearing dates and times can be found on the Civil Department Calendar Scheduling Chart.

All fees and papers must be filed in the Clerk's Office of the Court Location address listed above.

Date:  11/14/2018

Georgina Ramirez _____ , Deputy Clerk

**NOTICE OF CASE ASSIGNMENT**